FLORA R. HUNT, Administratrix of Estate of DAVID T. HUNT, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant.

Division One, March 7, 1924.

1. **NEGLIGENCE:** Warning: Sectionmen. Enginemen, or others in charge of running railroad trains, are not required to look out for sectionmen, among whom are to be included signal-repair men,

at work on or near the track, and are therefore not guilty of negligence in failing to ring the bell or sound the whistle, or otherwise warn them of the approach of the train, unless required to do so by some established rule or custom.

2. ———: ———: ———: **Exception: Rules.** A petition which charges that there was a rule of the company requiring enginemen to sound the whistle before the train passes around a curve in the track, where the view is obscure, for the purpose of warning switchmen and signal-repair men on or near the track, of the approach of the train, and that plaintiff's husband, a signal-repair man, was killed on such a curve by reason of the failure of the engineer to observe such rule and in failing to sound the whistle, states an exception to the general rule of duty towards trackmen which the general law imposes upon enginemen.

3. ———: ———: ———: **Rules: Considered Together.** All pertinent rules designed for the guidance and safety of the railroad's employees should be construed together, and a harmonious, and not a contradictory, effect given to them, if possible, in order that the intention of their establishment may be effectuated. And a rule that a "road-crossing whistle must be sounded, before passing around curves, where the view is obscure, between 6:30 A. M. and 6:30 P. M." applied to sectionmen and signalmen on the track, whether or not they used track-motors or hand-cars in their work, although another rule declared that "foremen going to or from their work, and all persons using hand or motor cars, must exercise care to avoid accident" and that "in places where the view of the track is obscure they must protect themselves with proper signals, when necessary." That said first rule was intended to apply to all employees in danger of being injured while upon curves, where the view is obscure, is plain from the provision that the road-crossing whistle must be sounded, before the train passes around such curves, between 6:30 in the morning and 6:30 in the evening—the time such employees are usually engaged in their work on the track.

4. ———: ———: ———: ———: ———: **Self-Reliance.** Where one rule of the railroad company, applicable to switchmen and signal-repair men at work on the track, declared that a "road-crossing whistle must be sounded, before passing around curves, where the view is obscure," another rule declaring that "employees are warned that it is unsafe to remain near the track while engines and trains are passing" and "employees are further warned that they should not rely on others to warn them of the approach of an engine or a train, but should themselves keep proper guard over

Hunt v. C. B. & Q. Railroad Co.

their own safety," does not mean that a signal-repair man, traveling on a motor car around a curve, where the view of the track is obscure, must not rely upon the enginemen of a rapidly approaching passenger train to sound the crossing signal, for such construction would nullify the preceding rule as a protection' to employees, but the reasonable construction of said second rule is that such trackmen must not themselves be guilty of negligence, but must exercise proper care for their own safety, and does not make it any less the duty of the enginemen to comply with the first rule.

5. ———: Failure to Sound Crossing Signal: Cause of Death. Where the rule of the company required a road-crossing whistle to "be sounded, before passing around curves, where the view is obscure," and the evidence shows that there was a curve in the track between eight hundred and a thousand feet long, obscured by trees and foliage, and when the engineer, of the passenger train rapidly approaching, but five minutes late, first saw the signal-repair man, two hundred feet away, he had dismounted and was standing between the rails, trying to push his motor car off of the track, it was for the jury to say whether, if the crossing whistle had been sounded, before the engine began to round the curve, the signalman would have been made aware of the approach of the train, hid from his view, and would have taken the two or three steps necessary to avoid being killed.

6. ———: ———: Federal Act: Contributory Negligence: Proximate Cause of Injury: Presumption of Due Care. In the absence of evidence to the contrary the presumption is that the signal-repair man was in the exercise of due care at the time he was killed; and under the Federal Employers' Liability Act contributory negligence does not bar recovery, but to have that effect deceased's own negligence must have been the proximate and sole cause of his death; and where the rule of the company required a road-crossing whistle to "be sounded, before passing around curves, where the view is obscure," and no one saw deceased, a signal-repair man, except the engineer, who saw him standing between the rails, trying to pull his motor car off of the track, when the engine was within two hundred feet of him, and the train, because of the curve, could not have been seen more than eight hundred or a thousand feet from the place where deceased was struck, which distance the train traveled in from ten to twelve seconds, it cannot be said, as a matter of law, that negligence of deceased, if any, was the proximate cause of his death—no whistle having been sounded.

7. ———: Instruction: Humanitarian Rule. Where the petition relied on the humanitarian rule as one ground for recovery, but also charged that the cause of deceased's death was the defendant's

failure to observe one of its own rules, and the case was submitted to the jury on the latter ground alone, it becomes unnecessary to consider whether it was error to refuse defendant's instruction to the effect that plaintiff could not recover under the humanitarian doctrine.

8. ———: ———: Contributory Negligence: Pleading. Where the petition alleged that the curve in the track obstructed the view of the engineman, it was not necessary for it to allege that it also obstructed the view of the train from deceased, for that would have been an element of contributory negligence, which, under the Federal Employers' Liability Act, could not affect plaintiff's right to recover; and if not alleged, it was the assumption of an unnecessary burden for the instruction to require the jury to find, as a condition of a verdict for plaintiff, that deceased's view of the train was obstructed by the curve.

9. ———: ———: Requiring Deceased to Be in Exercise of Ordinary Care. An instruction for plaintiff, in an action brought under the Federal Employers' Liability Act, which requires the jury to find that deceased at the time of his injury was in the exercise of ordinary care for his own safety, imposes a burden upon plaintiff which the law does not require her to take, and if she unnecessarily assumes that burden defendant cannot complain.

10. ———: ———: Measure of Damages: No Reduction for Contributory Negligence. Where the jury found that deceased was not guilty of contributory negligence, an instruction for plaintiff which omits a requirement that in assessing her damages they may reduce the same by a reasonable amount because of his contributory negligence, is not erroneous.

11. ———: ———: ———: Reference to Child. In a suit for damages for the negligent killing of plaintiff's husband, whose infant child survived him, an instruction telling the jury that they should take into consideration such reasonable rates of interest as "persons of the age and experience of said wife and child might reasonably be expected to derive from the investment of the money," etc., does not contain an unnecessary reference to the tender age of the infant child, or unjustly appeal to the sympathies of the jury.

12. ———: ———: ———: Life Expectancy: Uncalculated. An instruction on the measure of damages, in an action by the wife for the negligent killing of her husband, which directs the jury to "take into consideration the age, probable expectancy of life of deceased, the age and probable . expectancy of his wife," without telling them what such expectancies are, is not objectionable.

13. ——: ——: ——: **Present Cash Value.** An instruction, in a suit by a wife for the loss of her husband, which tells the jury to allow her as damages "the present cash value of the actual pecuniary loss," is not erroneous.

14. ——: **Excessive Verdict:** $14,500. Deceased was killed by the collision of his track-motor car with defendant's passenger train. At the time he was engaged in repairing signal devices used in interstate traffic, and his widow, as administratrix, sues, under the Federal Employers' Liability Act, for the pecuniary loss to herself and infant child. He was thirty-one years old, had always been in good health, was earning from $70 to $75 per month, and was the sole support of his family. His wife was thirty-two years of age, is not in good health, but is able to work a part of the time. *Held*, that a verdict for $14,500 is not excessive.

Headnotes 1 to 4: **Master and Servant:** 1 and 2, 26 Cyc. 1266; 3 and 4, 26 Cyc. 1163. Headnotes 5 and 6: **Master and Servant**, 26 Cyc. 1437, 1415; **Death**, 17 C. J. secs. 179, 92, 179. Headnotes 7, 9 and 10: **Appeal and Error:** 7, 4 C. J. sec. 2541; 9, 4 C. J. sec. 2890; 10, 4 C. J. sec. 3034. Headnote 8: **Master and Servant**, 26 Cyc. 1494. Headnote 11: **Trial**, 38 Cyc. 1683. Headnotes 12 to 14: **Death:** 12 and 13, 17 C. J. sec. 183; 14, 17 C. J. sec. 235.

Appeal from Buchanan Circuit Court.—*Hon. Thomas B. Allen*, Judge.

AFFIRMED.

*H. J. Nelson, J. C. Carr, J. G. Trimble* and *E. M. Spencer* for appellant.

(1) Peremptory instruction to find for the defendant should have been given. (a) Rule No. 920 did not apply to deceased. (b) If rule did apply and if whistle were not sounded, there is no proof that failure to sound whistle (if there was such failure) caused the accident. Ziegler v. Railways, 220 S. W. 1018; Battles v. Railway, 178 Mo. App. 596. (c) The negligence of the deceased was the sole cause of the accident. Woods v. Railroad, 187 S. W. 14. (2) The court erred in refusing to give instruction that plaintiff could not recover under the Humanitarian Doctrine. (a) There was no evidence the engineer, after becoming aware of the deceased's presence on the track, could have avoided the accident, but positive evidence he could not have done so. (b) No

causal connection between the alleged negligence and the accident was shown by testimony. Crone v. Railways, 236 S. W. 656. (3) The court erred in giving plaintiff's instruction numbered 4. (a) · It gave to the jury a wrong measure of damages. (b) It was so worded as to arouse the sympathies of the jury and cause them to increase the amount of the verdict. (c) It left the "present cash value" to pure guess—gave the jury no basis for calculation. (4) The court erred in giving plaintiff's instruction numbered 2. (a) It is so involved as to be incomprehensible. Its effect was to confuse and not to serve as a guide to the jury. (b) It falsely interpreted Rule 920, and put a duty upon defendant's engineer not put upon him by the rule, if the rule applied. (c) It submitted an issue not stated in the petition. Schwabe v. Moore, 187 Mo. App. 82. (d) It does not submit to the jury questions of fact which would constitute negligence, but characterizes and assumes the act of running the train "at a high rate of speed" to be negligence.

*Pross T. Cross* and *Mytton & Parkinson* for respondent.

(1) Proof of the existence of the rule requiring a whistle signal at approach of the curve, proof that deceased was struck on the curve and that same was obscure, and proof that whistle was not sounded, made a prima-facie case for the jury. While it is the general rule, upheld by a long list of decisions of this court, that sectionmen and other employees on the track must look out for their own safety, and that trainmen owe them no duty whatever in the way of signals to warn them (except in so far as the humanitarian doctrine may require), yet if a railroad adopts and puts in force a rule requiring the whistle to be blown at the approach of curves during working hours, then, in such cases, employees on the track have a right to rely on said rule being obeyed, and said whistle given, and the violation of said rule is actionable negligence. Kirkland v. Bixby, 222 S. W. 462; Rigley v. Prior, 233 S. W. 828; Dixon v. Railway, 109 Mo.

413; Woods v. Railway, 187 S. W. 11; Torantolla v. Railway, 226 S. W. 617. (a) Under the circumstances, the presumption attends that deceased was in the exercise of ordinary care at the time of his death. McDaniel v. Hines, 239 S. W. 471; Burtch v. Railway, 236 S. W. 338; Newell v. Bank, 279 Mo. 663; Weigman v. Railway, 223 Mo. 718; Riska v. Railway, 180 Mo. 168. (b) The violation of a rule by deceased would constitute contributory negligence and not assumption of risk. Richey on Fed. Emp. Liab. (2 Ed.) p. 169; Hadley v. Railroad, 156 N. W. 765; Holmberg v. Railroad, 155 N. W. 504; Oberline v. Railroad, 71 Ore 177. (c) And the burden of proving contributory negligence was upon the defendant. Hensley v. Railway Co., 214 S. W. 287; Peperkorn v. Transfer Co., 171 Mo. App. 709; Hegburg v. Railway, 164 Mo. App. 514. (2) Causal connection between the negligence proved and the injury need not be shown by direct and positive testimony, but it is sufficient if it be made to appear by reasonable and fair inference from facts and circumstances established in evidence. Stotler v. Railroad, 200 Mo. 135; Battles v. Railway, 178 Mo. App. 596; Schmidt v. Transit Co., 140 App. 182. Under the circumstances of this case, no other inference could be drawn from the proven facts, save and except that the deceased came to his death because he failed to be aware of the approach of the train; and he failed to be aware of the approach of the train because it came around this curve at high speed and without giving the whistle signal that deceased was accustomed to rely upon for warning. The jury were warranted in inferring from the fact that, had the whistle been sounded, Hunt would have been warned of the approach of the train and gotten off the track and to a place of safety. (3) There is no evidence whatever in the case that deceased Hunt was guilty of any negligence. Contributory negligence on the part of deceased is no defense, but defendant can only be relieved of liability in case deceased was guilty of negligence which was the sole cause of the injury. In the instant case, no one warned deceased of the approach of the train,

303 Mo. Sup.—8.

and there is no evidence that deceased knew the train was approaching upon him.

SMALL, C.—Suit for damages for the death of David T. Hunt, under the Federal Liability Act concerning employers. Hunt was killed by a collision between a track-motor car, which he was using, as defendant's servant, and a passenger train of the defendant, in Clay County, Missouri, between Liberty and Birmingham. Plaintiff is the widow and administratrix of said Hunt. At the time he was killed, Hunt was engaged, as a signal repairman, and was repairing defendant's signal devices, which were used in interstate traffic by defendant, and he was, therefore, at the time of his death, September 15, 1917, engaged in working in interstate commerce.

The petition contained allegations bringing the case within the humanitarian rule, and further alleged that at and before said date, under a rule or custom of defendant, the enginemen were required to sound the whistle before passing around curves, where the view is obscure, for the purpose of warning employees on its track of the approach of trains. That deceased knew of and relied on said rule, which, however, the enginemen violated, and negligently ran over him, upon such a curve, without sounding any whistle, as required by said rule. Plaintiff prayed for $60,000 damages.

The answer contained a general denial, assumption of risks and contributory negligence.

There was a verdict for plaintiff for $14,250, on which judgment was rendered, and from which defendant appealed to this court.

Plaintiff's evidence tended to prove that the deceased left the plaintiff, thirty-two years old, and an infant child, surviving him. He was thirty-one years old when he died, and always had been in good health. He had been a farmer, also a sectionman, and had worked at maintaining signals for about two months prior to his death. He was the sole support of his family. His wife is able to work some, but not all the time, as she is not in

very good health. His earnings were $70 to $75 per month.

George Sweat, a passenger on the train which ran over the deceased, testified in substance: He was in the baggage car with his little daughter, taking her to a hospital in Kansas City. She was on a cot. It was a clear day. The sun was shining, and it was very warm. Hunt was killed between Liberty and Birmingham, in Clay County. No whistle or signal was blown, before running over him. The baggage car was next to the tender, about thirty feet from the engine. The baggage car doors were open. There was only one road crossing between Liberty and the place where Hunt was struck. Hunt was struck north of that road crossing. After Hunt was killed, the train, after running a quarter of a mile and over that road crossing, stopped, and then backed up. It was a slow stop. Did not feel the application of the brakes. The train backed to where the body of Hunt was. It stopped with the baggage car opposite his body. His body was on the east side of the track. Witness and other passengers got off and looked at the body, which was taken in the baggage car. Hunt's motor car (the hand-car which he had been using) lay north of his body about one hundred feet. It was torn to pieces. There was a take-off, or kind of dirt dump, or platform, on the east side of the track there. It was used for taking off hand-cars. There was an oil can, and other little articles, on this take-off. The wrecked motor car lay about fifteen or sixteen feet south of the take-off, on the east side of the track. This take-off is right at the south end of the curve in the track, an abrupt or sharp curve. It obscured the view coming around. There is first a curve north of the take-off. North of the first curve there are about three or four other abrupt curves. This take-off, where the body was, is three or four miles south of Liberty. These curves obstruct the view. The first curve, north of the take-off, is in the shape of a letter "S." No whistle was sounded. Plaintiff's "Exhibit A" is a correct picture of the scene where

Hunt was killed, except that the, leaves were out in full on the trees when he was killed.

On cross-examination he testified that the train was a little late leaving Lathrop that morning. Could not say whether it whistled for all crossings. There were no whistles blown, after leaving Liberty, until after the accident. After they took on the body they whistled every few minutes. Witness did not know when the train struck Hunt. He first knew of that when the train backed up. These take-offs are for the men to take off their hand-cars or motor cars from the track. He has seen them along the track, and cars resting upon them, as trains pass by. The take-off, near where Hunt's body was, was just a little south of the curve. The track was not "plumb-straight there," it was just coming off the curve. It was close to the south end of the curve, and at the north end of where the track was straight. Standing on the take-off, as one looks north, it was a curve to the right; as the train was coming from the north, it was a curve to the left. The photograph, plaintiff's "Exhibit A," was taken January 10th, this year, 1922. It does not show far enough south to show where the body was. The man that took the photograph was standing right west of where the body had been. The whistling-post would be something like two or three hundred feet south of the take-off.

On re-direct examination he testified that there was no cut or bank alongside of the take-off. The bank was fifteen to twenty feet south of the take-off. The foliage was off the trees when plaintiff's "Exhibit A" was taken. At the time of the accident they were in full foliage. It was about twelve hundred or twelve hundred and fifty feet north of the take-off to where the track disappeared. At this point, defendant's attorney admitted that said signal devises were for the use of all trains, some of which were interstate, transporting passengers and goods from one state to another. The witness continued: Hunt was killed somewhere around ten o'clock in the forenoon. The road crossing was fourteen hundred and

eight feet south of the take-off. The train ran two or three hundred feet south of the road-crossing before it stopped. "We measured eight hundred feet of the twelve hundred and fifty feet we could see up the track from the take-off. Could see up the track further when leaves were off, at the time "Exhibit A" was taken, when witness estimated he could see up the track twelve hundred feet. At the time the accident happened, when the foliage was out on the trees and the undergrowth, one could see up the track from the take-off eight hundred to a thousand feet. When witness said he could see twelve hundred feet up the track, he meant twelve hundred feet from Mile Post No. 214, which is two hundred and twenty feet south of the take-off.

Several other passengers on the train testified: The whistle was not sounded, after leaving Liberty, prior to the accident. They also testified to the curve in the track, the location of the take-off, location of the hand-car, and its condition, and location of the body of Mr. Hunt, substantially as stated by the witness Sweat. Plaintiff thereupon introduced in evidence Rule No. 920 of the defendant, which was in force at and before the time of the accident, and was as follows:

"920. Road-crossing whistle must be sounded, before passing around curves, where the view is obscure, between the hours of 6:30 A. M. and 6:30 P. M."

This was all of plaintiff's testimony, at which time defendant offered a demurrer to plaintiff's evidence, which was refused.

Defendant offered in evidence the following additional rule:

"909. Employees are warned that it is unsafe to remain near the track while engines or trains are passing. Coal, stone, car doors and other articles are liable to fall from engines and trains. All are required for their own protection to retire to a safe distance from the track, on the approach of an engine or train, and to remain so, until the engine or train has passed. Employees are further warned that they should not rely on others to warn

them of the approach of a engine or a train, but should themselves keep proper guard over their own safety."

Tegler testified: It was Hunt's duty to renew the batteries that operate the signals, by putting in new soda, water and oil. At first Hunt used a velocipede car, and towards the last he used his own car, a Mudge motor car. The car weighed approximated four-hundred pounds. Such cars are taken off the track, by taking hold of the rear, and moving them around to the right, and then pulling them off; if they cannot be pulled off that way, you step around and lift them off. The witness employed Hunt for the company, gave him the book of rules, and the time cards, and instructed him always to be careful and save himself, if he didn't have time to get the car of. On cross-examination, referring to the curves in the track immediately north of where Hunt was killed, the witness said such curves were not unusual on that road. It was a pretty strong curve, but some curves were considerably sharper than that. That the picture, plaintiff's "Exhibit A," only shows four telegraph poles, before they go out of sight, on account of the sharpness of the curve. The telegraph poles are about one hundred and thirty-two feet apart. Witness knew nothing about the accident. Hunt was killed on the track, which was a part of his duty to look after.

Defendant here read in evidence Rules 47 and 213, as follows:

"47. Foremen going to and from their work, and all persons using hand or motor cars, must exercise care to avoid accident. In places where the view of the track is obscured, they must protect themselves with proper signals, when necessary.

"213. They must familiarize themselves with the rules of the operating department."

Leonard Potter testified: He was signal maintainer for defendant. Just before his death Hunt was engaged in signal work. Witness was also so engaged. On the way to replenish the batteries of a signal post, after Hunt's death, but on the same morning, he saw Hunt's

car, lying beside the track, thirty-five or forty-feet south of the take-off. There were marks of wheels on the ties and on the ground. The marks on the ground were about four feet east of the east rail. The marks on the car were on the front end on the right-hand side. The reaches were broken off, at the axle or boxing, and were indented in front of the axle and boxing. The usual way to take off such cars from the track is to lift the rear end and then go to the right, until the car is turned cross-ways of the track, which would require the man to take two steps, six to eight feet, and which would take him about four feet east of the east rail, if he was taking the car off on the east side of the track. At the road-crossing near Little Shoal Creek, south of where the accident occurred, witness noticed a car had been taken off that morning. He saw wheel marks where a car had been taken off at that crossing.

Tegler, recalled, testified: He saw the motor car of the deceased and the place of accident shortly after the accident happened. There were marks on the ground and the machine tending to show the machine had been partly off the track, and was injured in front.

William H. Seward, a civil-engineer, testified that from Signal Post No. 213, down to Mile Post 214, the track was down-grade about six-inches in a hundred feet for seven or eight hundred feet, and then level for almost three-quarters of a mile. There is a take-off close to the south end of the curve where the injury happened. As one goes north, beyond Mile-Post No. 214, there is a two-degree curve eight hundred and thirty feet long. Then, there is six hundred and ten feet of straight track. Then there is another curve to the left, as you go north, eleven hundred and eighty feet long, of one degree and thirty minutes. Then there is a straight track for eight hundred and fifty feet. Then a curve to the right of four degrees. A curve of two degrees departs from a straight line one foot and nine inches in going a hundred feet. A two-degree curve is not bad

at all. It is an easy curve for that country. Cross-examination: Standing on the curve, north of Mile-Post No. 214, witness saw an engine one thousand feet north. That is his estimate. It would be out of the line of vision after one thousand feet for quite a ways.

Fred Bing testified: That on the morning prior to Hunt's death witness was engaged in painting two center-signal poles, between Liberty and Birmingham. Hunt came up with his motor car, and changed the batteries that worked those two signals. Hunt took the battery-jars out of the well, and started to renew them. He left some of the jars on the ground. Hunt was there long enough to change about half of the batteries. Hunt left before the witness did. Hunt told witness he was going down to Little Shoal Creek to get a can of water to fill his batteries. He sat on his little motor car, and went towards Little Shoal Creek and witness saw no more of him alive. Witness remained at the signals, about fifteen minutes after Hunt left. Then he and his men put their cars on the track, and went in the same direction as Hunt did to the next signal post, about one half a mile away. They set off their cars there, and went to work on that signal. They also set off, to let Passenger Train No. 1 go by. It was past due, and came by in probably two or three minutes. Afterwards, short blasts of the whistle attracted his attention, and witness knew the train stopped. And then he heard it start up again. After No. 1 passed two of the men remained at the signals, and the rest went on towards Birmingham. When they reached the place where the accident occurred, the train had gone, but Hunt's car was there. It was broken up. Cross-examination: The signal posts where he last saw Hunt that morning were a little over a mile north of where Hunt was killed. When Hunt left the signal posts he put his car on the track and went south. Witness could not tell what time it was, but it was right close to No. 1's time, about nine o'clock. When witness saw Hunt's car, after the accident, it was on the east side of the track, wrecked and disabled, and showed it had been hit; the wheels were

gone. It was lying on its side. When Hunt left the witness he went around a curve, and was lost to view before he got to the next post. There are two or three curves in there, in the mile north of where Hunt was killed. Pretty good curves, curves where you lose sight of the track, and you cannot see a train around them. Did not see No. 1 when it stopped. It was hidden by the curve, the topography of the county, the trees and shrubbery and obstructions.

P. Evertson and Jesse Evertson, who were working with Bing in the paint gang, testified substantially as Bing did.

J. H. Wamble testified: He was fireman on the train that killed Hunt. Did not see the accident. Was putting in coal at the time. What attracted his attention was, the engineer whistled the stock alarm—a succession of short sounds, or blasts of the whistle. The engineer also shut the engine off, and applied the emergency brake. You could feel the train slow down immediately. Did not know what had happened until after the train stopped. We then backed up, and saw the man's body and broken vehicle. Cross-examination: We were going at a fast rate of speed, about the limit, forty five or fifty miles an hour. We were a little late, about five minutes, and trying to make up that time. That picture is a fair illustration of the curve in the track. It is a sharp curve. The obstructions keep you from seeing the track very far ahead of the train, and would keep a person on the track from seeing an on-coming train, at a very great distance. The train came to a stop in about twenty-five or thirty seconds, after the succession of blasts of the whistle. The engineer said the man was in the center of the track, trying to get a little velocipede off. He heard no other blasts of the whistle except those given about two hundred feet from where the man was hit. There are a number of curves there. Hunt was hit on the curve.

Andy Devoy testified that he was the engineer on the train that killed Hunt. The accident happened about nine-twenty in the morning. Witness was in his place on

the cab in his engine when he first saw Hunt, about two hundred feet away, standing in the middle of the track, trying to get his motor car off the track. The curve in the track, and the projecting boiler on the engine, prevented him from seeing the man earlier than he did. Hunt had the car partly off over the east rail. He had hold of the end of it, and was apparently trying to push it over the rail. When witness first saw Hunt, he shut off the speed. sounded several short blasts, got hold of the brakevalve, and threw the break on, as far as he could. There was nothing more he could do to stop the train. He did not see the engine strike Hunt, the boiler shut off his view. But he saw a hat fly across the track. Cross-examination: There is a very sharp curve there to the left. You cannot see very far around that curve. When I first saw him, the man was on the curve and I was on the point of the curve. I ran five or six hundred feet after I hit him. This sharp curve, with the woods, would keep a man, whichever side of the engine he was on, from seeing a man very far ahead of him. When I first saw him the man was about a hundred and fifty feet away from me, possibly two hundred. Could then see the man until within about twenty feet of him, when the boiler obstructed my view.

Plaintiff's rebuttal evidence was as follows:

Fred Hall testified: That he made measurements, observations and experiments on the track where the injury happened from positions corresponding to those occupied by the engineer in his cab. That one hundred and fifty feet north of the take-off, he could not see a person in the center of the track, near the take-off, and the nearest point, at which he could see the track south of there, was between four and five hundred feet south of the take-off. At points three hundred, four hundred, five hundred, six hundred and eight hundred feet north of the take-off, he could not see a man on any part of the track at the take-off or anywhere near it.

The court refused a demurrer to the evidence, offered by the defendant at the close of the testimony, and also

refused certain instructions asked by the defendant, and gave certain instructions for the plaintiff, which will be noticed in the opinion hereafter.

I.   It is well settled that the enginemen, or others in charge of operating trains, are not required to look out for sectionmen, which would include signal-repair men, while working on or near the track, and are, **Warning.** therefore, not guilty of negligence in failing to ring the bell, or sound the whistle, or otherwise warn them of the approach of trains, unless required to do so by some established rule or custom.   [Kirkland v. Bixby, 222 S. W. (Mo.) 462; Nivert v. Railroad, 232 Mo. 641; Rigley v. Prior, 233 S. W. (Mo.) 828; Dixon v. Railroad, 109 Mo. 413; Woods v. Railroad, 187 S. W. (Mo.) 11, and cases cited.]

II.   In the case we have in hand, the petition pleaded that there was a rule or custom requiring defendant's servants in charge of its engine and trains, to sound the whistle before passing around curves, where the **Exception.** view is obscure, for the purpose of warning employees on the track, of the approach of trains.   That Hunt was killed on such a curve, by the negligence of the enginemen, to observe said rule, and in failing to sound such whistle, in passing around such curve.   Consequently this case, as made by the petition, is based upon the exception to the general rule, mentioned in the preceding paragraph, as well as upon the humanity doctrine.

III.   We think, under the rules of defendant, introduced in evidence, considered and construed together, it was the duty of the enginemen, under Rule **Rules: Applicable to Motor Cars.** 920, to sound the road-crossing whistle at obscure curves, between the hours of 6:30 A. M. and 6:30 P. M., before passing around such curves, and the duty of the men on the track, under Rules 909 and 47 and 213, to exercise due care for their own protection and not rely on others to warn them of the approach of trains, and those using hand or motor cars, in places

where the view of the track was obscured, were required to protect themselves with proper signals, when necessary.

Whether defendant should have pleaded rules introduced by it under the Kirkland Case, supra, is not before us, as they were read in evidence without objection, and are not objected to in respondent's brief here.

Appellant does not apparently deny that said Rule 920 applies to section and trackmen, without hand or motor-cars, but says it does not apply to signal-repair men or other employees, with hand or motor cars, because said Rule 47 expressly requires employees, with such cars, to protect themselves, and where the view of the track is obscured with proper signals, when necessary. We do not agree to this contention. The rules should all be construed together and given a harmonious and not a contradictory effect, if reasonably possible, to carry out the intention of such rules as a body intended for the guidance and safety of the employees of the railroad company. We think Rule 920 applies both to sectionmen and signalmen, both of whom use track-motors or hand-cars in their work, when and whether they are using such cars or not. That said Rule 920 was intended to apply to all such employees in danger of being injured, while upon such curves, where the view is obscure, and which, the evidence shows, were quite numerous upon defendant's track, is plain, from the provision that a crossing whistle must be sounded before passing around such curves, between 6:30 A. M. and 6:30 P. M., the time such employees are usually engaged in their work on the tracks.

But, it is said that Rule 909 expressly provides that such employees must not rely on others, to warn them of **Self-Reliance.** the approach of an engine or train, and, therefore, it was not negligence, as to such employees, for the enginemen to fail to sound the crossing whistle at curves, as required by Rule 920. Such a construction would nullify Rule 920; and make it ineffective, for the purpose of protecting all employees on the track, which its humane provisions were evidently intended to

do.   We think a reasonable construction of Rule 909, would be that men on the track must not themselves be guilty of negligence by relying on the enginemen to protect them, as required by Rule 920, but must also exercise proper care for their own safety.   But, in view of the evidence danger, not only to the employees of the railroad company, but to the passengers also, whether such employees, on the track, could rely on such whistle being sounded or not, did not make it less the duty of the enginemen to comply with said Rule 920, and their failure to do so was evidence of negligence, for which defendant was responsible to all persons injured thereby, including track employees.   We rule this point against appellant.

IV.   But, it is urged that even if the enginemen were guilty of negligence, as to the deceased, in failing to blow the whistle, so as to warn him of the approach **Demurrer to** of the train, there is no evidence that such **Evidence.** negligence caused or contributed to his injury and death.   We must overrule this contention.

The defendant's evidence shows that the deceased was off his motor car, standing between the rails, trying to push his car off the track, when the engineer first saw him, two hundred feet away.   Under such circumstances, it was for the jury to say, if the crossing whistle had been sounded, before the engine passed around the curve, which was about eight hundred or a thousand feet long, as required by Rule 920, whether the deceased would not have been made aware of the approach of the train, in ample time to have taken a step or two, which was all that was necessary to avoid being injured thereby.   In Dixon v. Railroad, 109 Mo. l. c. 429, this court said: ''There was abundant direct evidence of the omission of the enginemen to sound the whistle signal as the train came around this obscure curve.   Defendant's rule and custom required such a signal, and the failure to give it was evidence of negligence on defendant's part in managing the locomotive.   If that omission should be found, as a fact, to have caused the death of Dixon [a quarry laborer on

the track] we cannot properly say that such finding would be an unreasonable inference from the evidence.''

V.   But it is said, plaintiff's evidence shows that the deceased could have seen the approaching train for eight hundred or a thousand feet, had he been looking north, in the direction of the train, which it was his duty to do, and his failure to do so, or negligently remaining on the track, after seeing the train, was the sole proximate cause of his death.

Proximate Cause.

It is not contended that the contributory negligence, if any, of the deceased, would bar the plaintiff's cause of action, given by the Federal statute, under which the suit is brought. But it is correctly assumed that such. negligence of the deceased would have to be the sole proximate cause of his death, to defeat the action of plaintiff.

Plaintiff's evidence, from which alone the conduct of the deceased, as a matter of law, must be determined, does not show whether he was going north or south, when he stopped his car, before the collision. No one saw him, just prior to his injury, until he was seen by the engineer of the train, who said that Hunt was then standing about two hundred feet away in the middle of the track endeavoring to push his car over the rails. The engineer does not say whether Hunt, when he saw him, was looking, or facing north towards the train, or was looking or facing south, with his back to the train. The engineer does not seem to have been interrogated on this point. There is nothing in the engineer's testimony showing that Hunt was aware of the approach of the train. From all that appears in the evidence, Hunt may at and before he stopped his motor car, and alighted therefrom, or even afterwards, have looked both ways, first looking north, without seeing the train, because it was hid from his vision by the curve in the track, and then looked south, at which moment, the train, going at fifty miles an hour, emerged from behind the bend in the track, and ran the eight hundred or thousand feet, it had to run, to reach

him, before he was aware of his danger. The time to make such run would have only been about ten or twelve seconds. There is no presumption that Hunt, before the engineer saw him on the tracks, did not look and listen, with due diligence, both ways, as the law, and the rules required him to do, for all approaching trains. No one saw him during that time. He is dead, and the presumption is he exercised due care, unless and until there is evidence to the contrary. [Burtch v. Railroad, 236 S. W. (Mo.) l. c. 340 and cases cited; Weller v. Railway, 164 Mo. l. c. 204-5; McDaniel v. Hines, 292 Mo. 401, 239 S. W. l. c. 471.]

We, therefore, hold, that the deceased was not guilty of contributory negligence, as a matter of law, and that whether he was guilty of contributory negligence, or negligence, which was the sole proximate cause of his injury and death, was a question for the jury. In our opinion, therefore, there being abundant evidence, indeed it is practically undisputed, that no crossing whistle was sounded, before passing over the curve in the track, as required by said Rule 920, there was a case for the jury under said rule, and defendant's demurrers to the evidence were properly refused. [Dixon v. Railroad, 109 Mo. 413; Rigley v. Pryor, 233 S. W. (Mo.) l. c. 830 *et seq.*]

VI. It is also urged, the court erred in refusing an instruction for appellant to the effect that plaintiff could not recover on the humanity doctrine. While **Humanitarian Rule.** that was one of the grounds, in the petition, the case was not submitted to the jury on that ground, but only on the failure to sound the crossing whistle, as required by Rule 920. We need not, therefore, pass upon whether there was a case under the humanity rule. It is not involved on this appeal.

VII. Instruction 2 given for plaintiff is objected to for the following reasons:

First: That said instruction creates an impression that at any time the view is obscured, the engineer is re-

Instruction.    quired to sound the whistle, and that it was his duty to be constantly on the lookout for employees on the track. We cannot agree to this contention. The instruction is long, but, in substance, states, that if the jury finds from the evidence, that the curves, and obstructions, if any, mentioned in the evidence, obscured a view of the track and persons upon the track, at said point (where deceased was killed) mentioned in the evidence, by operatives of the engine passing over said track from the north, and obscured the view, by persons upon the track, at said point, of a train, approaching from the north, and that defendant's servants, negligently ran an engine and train, in a southerly direction around said curve, at a high rate of speed, without causing any whistle to be sounded, as said engine moved around said curve, and the jury further find that so running said engine and train at a high rate of speed around said curve, without sounding a whistle on said engine, provided the jury so find, was a negligent act as defined in other instructions, and that said Hunt was struck and killed by reason of so running said engine and cars around said curve, without sounding the whistle, if this was done, and they further believe that Hunt was not guilty of contributory negligence, they will find a verdict for the plaintiff. Said instruction only makes the failure to blow the whistle negligent in case the curve in the tracks so obscured the deceased from the enginemen, as to make such failure to blow the whistle a neglignt act, in the judgment of the jury. We must, therefore, overrule defendant's first objection to said instruction.

Second: It is objected that said instruction is broader than the petition, in that the petition only alleged that the curve obstructed the view of the enginemen of the track to the south, and the instruction includes the idea that it also obstructed the view of persons on the track to the north. This objection is not good after verdict, as an allegation that the view to the south was obstructed by the curve in the track, also includes the idea that the view to the north was obstructed by the same

curve. In any event, it was not necessary for plaintiff to allege that said curve obstructed the view of the train from deceased. That was an element of contributory negligence, which did not affect plaintiff's right to recover, and if not embraced within the petition was simply the assumption of an unnecessary burden by the plaintiff in such instruction, of which appellant cannot justly complain. [Wolfe v. Payne, 294 Mo. 170, 241 S. W. l. c. 919; Callicotte v. Railroad, 274 Mo. 689, 204 S. W. 529.]

Third: It is objected that the instruction itself characterizes the failure to blow the whistle as negligence. We do not so regard it. It leaves the failure to blow the whistle as a circumstance, or as evidence from which the jury may infer negligence. This was proper.

Fourth: It is contended said instruction submitted the "high rate of speed" in itself as negligence. We do not think so. The high rate of speed was submitted, as one of the circumstances, under which the train was run around the curve, without sounding the whistle, which the jury might consider, in determining whether the failure to blow the whistle was negligence. If defendant's instruction numbered 2 which the court gave, conflicted with plaintiff's instruction in this respect, defendant's said instruction would be erroneous, and it could complain of said conflict as error. [Myers v. Railroad, 296 Mo. 239, 246 S. W. l. c. 266.] But defendant's instruction numbered 2, in effect, simply told the jury that the high rate of speed did not tend to show negligence *"in that regard."* That is, *in regard to the speed of the train,* as an independent act of negligence.

Fifth: It is also objected that said instruction given for plaintiff required the jury, before they could find for plaintiff, to find that said Hunt was injured "while in the exercise of ordinary care, for his own safety." The contention of appellant on this point is, that contributory negligence was not a defense, to plaintiff's cause of action, if it existed, but only went in diminution of plaintiff's damages, and that the jury would more readily find that the deceased was not guilty of contributory neg-

303 Mo. Sup.—9.

ligence, if they were required to do so, in order to find any verdict at all for the plaintiff, than if such contributory negligence was simply submitted as in reduction ·of the amount of damages which plaintiff might recover. We do not agree to this contention. Said instruction by requiring the jury to find that said Hunt was in the exercise of ordinary care, for his own safety, when he was injured, simply imposed an additional burden upon the plaintiff, which the law did not require her to take, but of which defendant cannot complain [Wolf v. Payne, supra; Callicotte v. Railroad, supra.] The defendant could have asked an instruction, taking this burden from the plaintiff, but having failed to do so, after having received the benefit of plaintiff carrying such burden, in the trial of the case, ought not now be held to assert that plaintiff erroneously or unnecessarily assumed such burden.

VIII. Plaintiff's instruction numbered 4, given by the court, on the measure of damages, is objected to, because it did not submit to the jury that if the plaintiff's deceased husband was guilty of contributory negligence, the jury should make a proportional reduction in the amount of the damages plaintiff might recover. McIntyre v. Railroad, 227 S. W. (Mo.) 1055, is cited as so holding. Whether that case so decided, we need not inquire. In the case before us, which was not so in the McIntyre Case, under plaintiff's instruction numbered 2, the jury found the deceased was not guilty of contributory negligence, and therefore the omission in said instruction, on the measure of damages, providing for the contingency of his being guilty of contributory negligence was wholly immaterial.

*Measure of Damages.*

It is also objected that said Instruction number 4 contains the following language: ''And the jury will take into consideration such reasonable rates of interest as the jury shall find, and believe from the evidence, that persons of the age and experience of said wife and child might reasonably be expected to derive from the investment of the mony so awarded, if any, in reasonably safe

securities.'' We do not think this was an unnecessary reference to the tender age (a few months) of the infant of the deceased Hunt, for the purpose of appealing to the sympathy of the jury, as suggested by appellant. The precise language was contained in the instruction on the measure of damages in the Burtch Case, 236 S. W. 346, and was approved by this court *en banc.* Furthermore, we see no substance in said objection.

Nor is plaintiff's instruction number 4, objectionable, because it directs the jury to ''take into consideration the age, probable expectancy in life . . . of David T. Hunt, the age and probable expectancy of his wife,'' . . . without telling the jury what such expectancies were. This was a question of fact for the jury to determine from the age and circumstances of the parties shown in evidence.

Nor was said instruction erroneous, as claimed, because the jury were instructed to allow as damages, ''the present cash value of the actual pecuniary loss.'' This language was also in the instruction which was approved by us in the Burtch Case.

We find no error in plaintiff's Instruction 4, on the measure of damages.

IX. As to defendant's refused Instructions numbered 3 and A, B, C and D. This opinion is already too long, and it would extend it beyond reason to set out said instructions herein. We have examined them carefully. It is sufficient to say of them that they are all based on the theory that the deceased, himself, was alone bound to exercise any care for his protection. And that he assumed all the risk of being injured by approaching trains, on obscure curves, as well as at all other places on the tracks, in all respects, the same as if said Rule 920 was not in existence, which said instructions entirely ignore and leave out of the case.

They were all, therefore, properly refused.

X. The objection to colloquies between counsel, and argument of respondent's counsel to the jury, is too general to invoke the action of this court thereon. No particular passages are pointed out as objectionable, and such arguments and colloquies cover twenty-two pages of the printed record. We must decline, therefore, to sustain this contention of appellant.

**Argument to Jury.**

XI. The verdict in this case was for $14,250, and is not so excessive as to warrant our interference. In McIntyre v. Railroad, 227 S. W. 1055, we affirmed a verdict for $16,000; in Crecelius v. Railroad, 223 S. W. 413, we affirmed a verdict for $15,000. These cases were under the Federal act and were substantially like the case at bar.

Finding no error, the judgment below is affirmed. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinon by SMALL, C., is adopted as the opinion of the court. All of the judges concur.