OF THE

## STATE OF MISSOURI

AT THE

### APRIL TERM, 1925.

(*Continued from Vol.* 309)

NELLIE KIDD, Administratrix of Estate of CLYDE KIDD, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

Division One, July 30, 1925.

1. **NEGLIGENCE: Defective Engine: Escaping Steam: U. S. Boiler Act: Injury to Passing Pedestrian.** A steam engine, attached to a long interstate freight train about to enter a town on an upgrade, was out of water, practically out of coal and its steam so low that it was practically useless. It was taken to the near-by roundhouse, supplied with coal and water, taken back and coupled onto the train, and pulled the train a short distance, but again stalled because out of steam. Its main throttle and its drifting throttle, or valve, were leaking badly, and the engineer made two or three unsuccessful attempts to shut off the drifting throttle, and in order to prevent the cylinders from filling with water necessarily opened the cylinder cocks, which permitted the steam to escape. The engine grates were also out of order, so

that they could not be shaken, making it necessary to turn on the blower, the purpose of which was to create a draft through the flues and grates and thereby make a hotter fire. The escaping steam from the cylinder cocks made a hissing noise, and mingled with clouds of coal smoke, and the blower made an additional noise, and in this condition the engine was permitted to remain attached to the stalled train for an hour and a half before the fatal accident, although the division engine roundhouse was only a half mile away. *Held*, that the use of the engine was unlawful under the Federal Locomotive Boiler Act, making it unlawful for a common carrier "to use any locomotive engine propelled by steam power in moving interstate traffic unless the boiler of said locomotive and appurtenances thereof are in proper condition and safe to operate, . . . without unnecessary peril to life or limb," and the amendment of 1915 making the act "apply to and include the entire locomotive, tender and all parts and appurtenances thereof." And where the engineer of another interstate freight train, compelled to stop and be abandoned because said stalled train obstructed the track, having started to the company's office to register his report as was his duty, in passing such defective engine and in order to avoid its escaping steam, stepped upon the near-by companion track of the double-track railroad, and was immediately struck and killed by a belated interstate passenger train approaching thereon from behind and running at an excessive and unlawful rate of speed, which he neither saw nor heard, because of its failure to give proper signal warnings and because of the clouds of escaping steam and noise from the crippled engine, the railroad company is liable in damages, if the unlawful use of the defective engine was in whole or in part the proximate cause of the engineer's injury, or its escaping steam and unusual noises were the proximate or a contributing cause.

2. ———: Proximate Cause: Concurring Acts of Different Agents: Escaping Steam from Crippled Engine. An unusal amount of steam was, by reason of the crippled condition of an engine, unlawfully used as a part of an interstate freight train, caused to escape from its cylinder cocks, accompanied by loud and unusual noises, accentuated by the use of the engine blower. The steam from the engine, stalled on the east track of a double-track railroad in a deep cut, commingled with its coal smoke, was blown westward, across the west track, to the embankment on the west side, and obscured the vision of one walking in the steam and also the vision of the enginemen of a passenger train approaching rapidly on the west track. To avoid being burned by the steam, a danger usually apprehended by enginemen, the engineer of another interstate freight train on the east track, compelled to stop because of the

stalled train, walked on the space between the two tracks until he reached the crippled engine, and there turned aside onto the west track, and was immediately struck by the passenger train, which was being negligently run at an unlawful speed. *Held*, that the unlawful use of the defective engine on the east track and the negligent operation of the passenger train on the west track, being concurrent negligent acts of a single defendant, although acting through different agents, were the proximate cause of the injury. Although the unlawful use of the defective engine would not alone have caused the injury, yet as it contributed to and operated conjointly with the negligent operation of the train to cause the engineer's death, both acts are to be considered together as the one proximate cause.

3. ———: ———: **Question for Jury.** What is the proximate cause of an injury is ordinarily a question for the jury to determine, and not a question of science or legal knowledge. In every transaction there is a succession of events, more or less dependent upon those preceding, and it is the province of the jury to consider this succession, and ascertain, from a view of the facts and circumstances, whether the events are naturally and probably connected with each other by a continuous sequence, or are dissevered by new and independent agencies.

4. ———: **Excessive Speed: Proximate and Contributory Cause.** The violation of a speed ordinance or railroad rule is negligence *per se*. Where the ordinance limited the speed of railroad trains to twelve miles per hour and the printed rule of the defendant railroad company stated that a maximum speed of ten miles per hour within the town must not be exceeded, and such rule was promulgated for the safety of both employees and passengers, the running of an interstate passenger train within the corporate limits at a speed of from thirty to forty miles per hour was negligence; and if such negligence concurred and cooperated with the unlawful use of a defective engine on the adjoining track, by whose escaping steam the engineer of another train was induced, in the performance of his employment duties, and to avoid the danger of being burned, to step upon the track upon which the passenger train was approaching from behind and was immediately killed, such negligence was the proximate cause of the injury, where there was substantial evidence that it could have been avoided if the train had been run at a lawful rate.

5. ———: **Control of Train: Lookout: Warning: Obscure Place: Right to Clear Track.** The track ran through a deep cut, upon a curve of three per cent; there was evidence that the right-of-way had been so generally used by the pedestrian public as to indicate that en-

ginemen had no right to expect a clear track; two freight trains, with a combined length of 135 cars, stood upon the adjoining track and indicated that there might be trainmen upon or about the track in the vicinity of the curve and of the engine of the foremost train; the engineer of one of them was struck by the rapidly running train; there was evidence that the curvature of the track was such that a person standing between its rails could not be seen by the engineer; the rules of the company required two long and two short blasts of the engine whistle to be sounded as trains approached obscure places, and there was evidence that the blasts were and that they were not sounded. *Held*, that the issue (a) whether defendant negligently failed to have the train under reasonable control and (b) negligently failed to keep a reasonable lookout for deceased and to give timely warning by whistle of the train's approach, was a question for the jury, as was also the question whether deceased would have heard the whistle above the unusual noises had it been sounded.

6. ———: *Failure to Anticipate Unusual Circumstances.* Where the engineer of the defective engine unlawfully retained it stationary upon the east track for an hour and a half within a half mile of a division engine round-house, in a futile effort to produce enough steam to haul its stalled train, and could reasonably have anticipated that the escape of an unusual amount of steam therefrom would cause trainmen of another train, thereby also stopped, to pass around the engine to avoid the danger of being burned and to walk upon the adjoining west track where trains were likely to run at any time, and the engineer of a passenger train on that west track could reasonably have anticipated that the running of the train around the curve and into the deep cut where the engine was stalled, with knowledge of the general use of the tracks by trainmen and the public, at an excessive speed and without timely warning by whistle, might result in injury to persons on the track, it was defendant's duty to anticipate such injuries, and the rule that it is not negligence not to take precautionary measures to prevent an injury when the injury could not reasonably have been anticipated and would not, except under exceptional circumstances, have happened, does not apply. Nor was it essential that defendant should have anticipated the very injury it inflicted, or that it would occur in the exact manner it did.

7. ———: *Assumed Risk: Jury Question.* The servant does not assume the risk unless the danger occasioned by his master's negligence is so glaring and obviously apparent to the servant as to threaten imminent danger; and where the evidence is such as to produce substantial doubt upon the question whether the danger occasioned by the master's negligence was so obvious that an

ordinarily prudent person under the circumstances would have observed it and thereby have avoided injury, the question of the servant's assumption of the risk is one for the jury.

8. ————: Contributory: Federal Statutes: Violation by Defendant. In an action for damages brought under the Federal Employers' Liability Act, contributory negligence does not bar recovery, but the damages must be diminished by the jury in proportion to the amount of negligence attributable to the deceased employee, unless the carrier has violated a statute (the Boiler Act) enacted for the safety of employees, and such violation contributed to the employee's injury or death, in which case the employee is not held guilty of contributory negligence. Unless deceased employee was negligent and unless his negligence, as a matter of law, was the sole proximate cause of his injury, his contributory negligence is a question for the jury to consider in connection with the assessment of damages, under proper instructions.

9. ————: ————: Looking for Approaching Train: Question for Jury. Admitting that it was the duty of the deceased engineer to look for a train behind him before stepping upon a track, it cannot be ruled as a matter of law that he was negligent if there is no substantial evidence that had he looked he could have seen the train in time to avoid it, or that he did not look; at most the question of his negligence is for the jury to decide. Where there is no evidence that he did not look, the law presumes right action and that he did look. And where at most only six or eight seconds intervened between the time the train could have been seen and he was struck by it, it cannot be imperatively ruled, as a matter of law, that he was negligent in not looking, even if there were evidence that he did not look.

10. INSTRUCTIONS: Length and Minuteness: Confusion. The length and minuteness of long and somewhat involved instructions, if reasonably clear and not likely to be misunderstood by the jury, do not constitute reversible error.

11. NEGLIGENCE: Instruction: Based on Allegations and Evidence. Instructions which submit no act of negligence except such as are alleged in the petition and supported by the evidence do not authorize the jury to convict defendant of negligence on general grounds.

12. ————: ————: Sounding Bell: Arbitrary Standard. An instruction requiring the jury to believe that, "under all the facts and circumstances mentioned in evidence, reasonable and ordinary care for the safety of deceased and others on and along said track, at said time and place, required that the locomotive steam whistle on said passenger train be sounded at reasonable intervals while in

said cut and while approaching said curve, and within reasonable hearing distance of said deceased, and within a reasonable hearing distance north of said curve," did not so set up an arbitrary standard of care respecting the sounding of whistles at intervals as invaded the province of the jury.

13. ———: ———: Taking Defective Engine out of Service: Arbitrary Standard. An instruction which required the jury to believe from the evidence that "said locomotive engine had defective steam valves and a defective throttle valve and apparatus and that said defects caused said engine to throw out, and permit to escape, a large and unusual volume of steam and vapor . . . and that, by reason of said defects, said engine was not in a reasonably proper condition and not reasonably safe to operate and use without unnecessary peril to life and limb; and . . . that ordinary and reasonable care required that the defendant, acting through its officers, agents and engineer in charge of said engine, provide and furnish another and different engine to haul said train into its yards; and that defendant was negligent in so using said engine in its said defective condition and with the steam and vapor escaping as mentioned in evidence," did not so set up an arbitrary standard of care in respect to taking the engine out of service as invaded the province of the jury.

14. ———: ———: Assumption of Causal Connection. An instruction which requires the jury to believe from the evidence that "the death of said deceased was directly caused, in whole or in part, by said acts and omissions" and that "by exercising reasonable care in the aforesaid particulars . . . defendant's employees . . . could have kept from killing deceased," does not assume that the alleged acts and omissions were the cause of the fatal injury or the existence of the element of causal connection essential to recovery.

15. ———: ———: Measure of Damages: Contributory Negligence. An instruction on the measure of damages in an action brought under the Federal Employers' Act, which does not in express words direct the jury to consider the contributory negligence of deceased, is not erroneous, if it tells them that the measure of damages is to be considered in connection with a certain other instruction, and such other tells them that if deceased was exercising ordinary and reasonable care he was not guilty of contributory negligence and there can be no diminution of the damages assessed, but if he was guilty of contributory negligence the damages assessed must be diminished in proportion to the amount of negligence attributable to him.

Kidd v. Rock Island Railway Co.

16. ————: Evidence: Custom. Testimony of an engineer that it was the usual practice of trainmen to pass around steam escaping from a locomotive, and what was the usual, customary and proper place to sound the whistle of trains approaching a certain street crossing and a certain curve in the track, is admissible.

17. ————: ————: Defective Engine: Unalleged Defects. The admission in evidence of work reports showing various defects in the engine whose use it is charged was unlawful under the Federal statute, not specifically alleged to exist during the month of the injury, is harmless error, where the jury are by the instructions limited to a consideration of those defects alleged. Under the statute defendant was not relieved of the, duty to use an engine meeting its requirements, even though the engine had never been out of order before and the defects alleged had occurred for the first time on the day of the injury.

18. JURY: Panel of Twenty: Harmless Error. Where twenty qualified jurors were retained on the panel in a civil case, and plaintiff peremptorily challenged four of them, the nineteenth and twentieth on the list being two of the four, thus giving to plaintiff only two challenges out of the first eighteen names on the list, and the defendant then struck off four names, thus giving to defendant four challenges out of the first eighteen names, and nothing appears to indicate that any harm came to defendant from this manner of selecting the trial jury of twelve men, and no bias or prejudice of any juror is shown or suggested, the judgment in favor of plaintiff will not be reversed upon defendant's appeal, but it would be reversed if injustice or injury were made to appear.

19. EXCESSIVE VERDICT: Thirty Thousand Dollars: Instant Death of Engineer. Where the engineer was instantly killed by defendant's train, and hence no element of pain or suffering enters into the case, this court is in as good position as the jury to determine from the facts the pecuniary damages that ought to be awarded to his widow and minor children. Deceased was thirty-five years of age, had been in defendant's employ for thirteen years, and his life expectancy by the American Experience Mortality Tables was 31.78 years. He was a railroad locomotive engineer, his health was good, and his earnings, which averaged $184 per month, were turned over to his wife, and expended on his family, except what was necessary to pay his room-rent and board while he was in other towns. His wife, aged thirty-four years, and four children, aged ten, seven, four and one year, survived him, and the widow, as administratrix of his estate, sues, under the Federal Employers' Liability Act, for the benefit of herself and said minor children. Held, that, while it is a logical presumption that a railroad en-

gineer thirty-five years of age has not reached the maximum of his earning capacity, the fact remains that railroading is an extremely hazardous vocation and that the life expectancy of one so employed is somewhat less than that shown by the American Experience Tables; and as the income from twenty-five thousand dollars, properly invested in safe securities or investments, will closely approximate the net earnings of deceased at the time of his death, the judgment is affirmed only upon condition that plaintiff remit five thousand dollars from the verdict for thirty thousand.

Corpus Juris-Cyc. References: Appeal and Error, 4 C. J., Section 2834, p. 854, n. 64; Section 2932, p. 951, n. 75; Section 2952, p. 969, n. 56; Section 2974, p. 992, n. 39; Section 2985, p. 1002, n. 41. Death, 17 C. J., Section 235, p. 1350, n. 6. Evidence, 22 C. J., Section 778, p. 684, n. 27. Juries, 35 C. J., Section 230, p. 272, n. 66; Section 396, p. 358, n. 96 New. Master and Servant, 39 C. J., Section 417, p. 291, n. 53, 54; Section 498, p. 381, n. 35, 36; Section 579, p. 464, n. 44; Section 892, p. 689, n. 74; Section 893, p. 690, n. 82, 83; Section 896, p. 692, n. 6; Section 933, p. 726, n. 3; Section 1032, p. 820, n. 60, p. 821, n. 62; Section 1035, p. 822, n. 84; Section 1309, p. 1113, n. 49; Section 1314, p. 1120, n. 74; Section 1316, p. 1122, n. 83, 84; Section 1345, p. 1163, n. 32, 41, 42, p. 1164, n. 43; Section 1361, p. 1179, n. 75; Section 1364, p. 1187, n. 10; Section 1365, p. 1188, n. 14, p. 1189, n. 16; Section 1374, p. 1199, n. 43; Section 1398, p. 1213, n. 26; Section 1401, p. 1220, n. 67; Section 1402, p. 1220, n. 71; Section 1403, p. 1222, n. 87, p. 1223, n. 97; Section 1414, p. 1238, n. 96. Negligence, 29 Cyc., p. 436, n. 51; p. 639, n. 4. Railroads, 33 Cyc. p. 670, n. 2, 3. Trial, 38 Cyc. p. 1615, n. 19; p. 1653, n. 11 New; p. 1666, n. 83 New; p. 1689, n. 28; p. 1778, n. 73; p. 1779, n. 74, 75.

Appeal from Grundy Circuit Court.—*Hon. Leonidas B. Woods,* Judge.

AFFIRMED (*upon condition*).

*Luther Burns, Conrad & Durham* and *Hale Houts* for appellant.

(1) Plaintiff failed to make a case. The record fails to disclose any actionable negligence on the part of defendant, or any negligence which was the proximate cause of the death of plaintiff's intestate; but, on the contrary, shows that deceased's negligence was the sole proximate cause of his fatal injury. Relyea v. Railway, 112 Mo. 96; Degonia v. Railroad, 224 Mo. 594; State ex rel. v. Ellison, 271 Mo. 468; American Brewing Co. v. Talbott, 141 Mo. 674; Fuchs v. St. Louis, 167 Mo. 652; Cook v. Railroad, 162 Mo. 659; Flack v. Railroad, 285

Mo. 49; McColmont v. Railway, 233 Fed. 231. (2) The court erred in overruling defendant's objection to a panel of more than eighteen jurors, and in requiring the selection of the jury from a panel of twenty. Sec. 6630, R. S. 1919; Clark v. Railroad, 234 Mo. 416; Reese v. Railroad, 156 Mo. App. 586. (3) The court erred in refusing defendant's several requested instructions numbered 2, 6, 8 and 9, by which defendant sought to have excluded from the consideration of the jury various specific charges of negligence. (4) The court erred in giving plaintiff's instruction 3, which broadened the issues. Beave v. Transfer Co., 212 Mo. 331. (5) Instruction number 4 was erroneous in that it submitted false issues and the instructions as a whole were erroneous in that by reason of their length and fullness of detail and repetition they were confusing to the jury and prejudicial to the defendant. (6) The court erred in giving plaintiff's instruction numbered 4 for the reason that it assumed that the alleged negligence on the part of defendant's employees was the proximate cause of the fatal injury. Zini v. Railway, 235 S. W. 87; Stark v. Bingiman, 223 S. W. 946; McLaughlin v. Marlatt, 228 Mo. 877. (7) The verdict was excessive. Midway Bank & Trust Co. v. Davis, 288 Mo. 585; Crecelius v. Railway, 284 Mo. 26; Burtch v. Railway, 236 S. W. 335.

*A. G. Knight, Platt Hubbell* and *Geo. H. Hubbel* for respondent.

(1) The appellant was negligent in (a) failing to sound the locomotive whistle of the passenger train, in accordance with its own rules, and the exercise of reasonable care, in the circumstances; and (b) in operating the passenger train at excessive speed in violation of its own rules, the city ordinance, and the exercise of reasonable care, in the circumstances; and, all of said acts and omissions of negligence predicated in respondent's instruction numbered four united and combined at the time with the negligence of the appellant in the use of defective engine 3002 as proximate causes of the death of the deceased. Greenwell v. Ry. Co., 224 S. W. 407; St. Louis

Railway Co. v. Jeffries, 276 Fed. 75; Hubbard v. Wabash Ry. Co., 193 S. W. 582; Southern Ry. Co. v. Smith, 205 Fed. 360; Norfolk & W. Ry. Co. v. Holbrook, 215 Fed. 689, 59 L. Ed. 392, 235 U. S. 625; Norfolk Ry. Co. v. Earnest, Ann. Cas. 1914C, 172, 57 L. Ed. 1096, 229 U. S. 114; Delaware L. & W. R. Co. v. Hughes, 240 Fed. 941. (2) The use of the defective locomotive, at the time and place of the death, was a violation of the Federal Loco-motive Boiler Act of February 17, 1911, as amended March 4, 1915, the violation of said act was one of the proximate and contributing causes of the death. In such circumstances, the Federal Employers' Liability Act eliminates any issue of assumption of risk or contributory negligence from the case. 8 U. S. Comp. Stat. Ann. (1916) sec. 8631; 8 Fed. Stat. Ann. (2 Ed.) 1200, 1205; Haas v. Erie Ry. Co., 254 Pa. 235; L. & N. Railroad Co. v. Layton, 243 U. S. 617; Wolfe v. Payne, 294 Mo. 170; Central Ry. Co. v. White, 238 U. S. 507. (3) In addi-tion to the negligent use of defective engine eliminating any issue of contributory negligence or assumption of risk in this case, the record and the facts eliminate any claim of contributory negligence or assumption of risk. Davis v. Slocum, 288 Fed. 354; Adams v. Railroad Co., 287 Mo. 552; Yazoo & Miss. V. Ry. Co. v. Wright, 235 U. S. 376; Cheaspeake & O. Ry. Co. v. De Atley, 241 U. S. 310, 60 L. Ed. 1016; Erie Ry. Co. v. Puruker, 244 U. S. 320, 61 L. Ed. 1166. (4) The verdict of thirty thous-and dollars in this case is not excessive. Beaumont Ry. Co. v. Sterling, 260 S. W. 320; Hines v. Mills, 218 S. W. 780; Texas Ry. Co. v. Herrington, 241 S. W. 250; Rigley v. Pryor, 290 Mo. 10; Page v. Payne, 293 Mo. 600. (5) In the empaneling of the jury, there was no error com-mitted. Stevens v. Union Ry. Co., 66 L. R. A. (O. S.) 469, 26 R. I. 90; State v. Faulkner, 175 Mo. 578; Bank v. Durrill, 61 Mo. App. 546. (6) The work reports are legal evidence for the purpose of showing notice of the three steam leaks, and the defective condition of the grates and grate shaker, thus rendering the use of the humming blower necessary. B. & O. Ry. Co. v. Flecht-ner, 300 Fed. 318; 8 U. S. Comp. Stat. (1916) p.

9249, sec. 8592; Vicksburg Railroad Co. v. Putnam, 30 L. Ed. 257, 118 U. S. 545; Anchor Milling Co. v. Walsh, 108 Mo. 277; Robinson v. Smith, 111 Mo. 205; Stuyvaert v. Arnold, 122 Mo. App. 421; 1 Wigmore on Ev. (2 Ed.) 524; Swadley v. Mo. Pac. Ry. Co., 118 Mo. 268.

SEDDON, C.—Action by plaintiff, the widow of Clyde Kidd, as administratrix of her late husband's estate, for the benefit of herself and deceased's minor children, to recover damages for the death of said Clyde Kidd by reason of the alleged negligence of defendant. Plaintiff seeks recovery under the Federal Employers' Liability Act of April 22, 1908, as amended on April 5, 1910 (U. S. Compiled Statutes, secs 8657-8665), and also under the Federal Locomotive Boiler Act of February 17, 1911, as amended on March 4, 1915 (U. S. Compiled Statutes, secs. 8631 and 8639-a).

Decedent was instantly killed by passenger train number 57 on one of defendant's main tracks in the city of Trenton, Missouri, about 6:35 o'clock on the morning of October 24, 1922. Defendant's double-track railroad enters Trenton from the north, and runs south and southeasterly from the north city limits for a distance of slightly less than one mile to defendant's depot and switch-yards, with their incident yard office, round-house and engineer's washroom, Trenton being a terminal or division point of defendant railway. In order the better to visualize the scene and surroundings of the fatality, it is necessary to bear in mind certain physical objects adjacent to defendant's right-of-way and their relative distances with respect to each other. Approaching Trenton from the north, the station post, which is exactly one mile north of defendant's depot, is located on the west side of the right-of-way adjacent to the west track. This station post marks the point at which the usual station whistle, consisting of one long blast, is customarily given by all south-bound trains approaching Trenton. Two semaphores, or electric block signal posts, are located, one on each side of the right-of-way, 135 feet south of the station post. An overhead street cross-

ing or bridge, used for vehicular and pedestrian traffic, known as Rainbow Bridge, bridges defendant's right-of-way east-and-west at 22nd Street, and is the central object used by the witnesses in fixing the relative distances of other physical objects with respect to the *locus in quo.* Rainbow Bridge is 2480 feet south of the station post, and 2800 feet north of the Rock Island depot, and the two semaphores above referred to are 2345 feet north of Rainbow Bridge. The northern city limit or corporate boundary line of Trenton is 600 feet south of the station post, and 1880 feet north of Rainbow Bridge. The double-track railroad of defendant enters a deep cut, having embankments on the east and west sides, the north end of this cut being 1200 feet south of the station post and 1280 feet north of Rainbow Bridge. This cut is about 2280 feet long, the south end of the cut being approximately at Mable Street crossing, a grade crossing across the right-of-way, 1000 feet southeasterly from Rainbow Bridge. The steepest place or depth of the embankment on the east side of the cut is 66 feet at a point 100 feet north of Rainbow Bridge, and the steepest place or depth of the embankment on the west side of the cut is 48 feet at a point 125 feet north of Rainbow Bridge. The two parallel tracks of defendant run north and south for some considerable distance north of the city of Trenton, and continue to run in a north and south direction for a distance of about 800 feet south of the north entrance to the cut. The two parallel tracks then curve to the southeast. The curve in the tracks is 1020 feet in length. It begins 2000 feet south of the station post and 480 feet north of Rainbow Bridge, and ends 3020 feet south of the station post and 540 feet south of Rainbow Bridge. The curvature of the tracks is a three per cent curve, and the most westward point in the curve is 100 to 125 feet north of Rainbow Bridge. Mable Street (a north-and-south street) and 18th Street (an east-and-west street) intersect at right angles, and cross defendant's right-of-way on grade at approximately, or very near, their intersection. This crossing is known as Mable Street crossing, and is the only grade crossing across the rail-

road tracks between defendant's depot and the north city limit of Trenton.  Mable Street crossing is 1000 feet southeasterly from Rainbow Bridge, and the south end of the curve in the tracks is 459 feet northerly of Mable Street crossing.  From a point 459 feet north of Mable Street crossing, the two parallel railroad tracks run approximately straight in a southeasterly direction to defendant's depot.  The eighty-rod customary whistling point for Mable Street crossing is on the curve about 320 feet north of Rainbow Bridge, and about 1320 feet north of Mable Street.  Four east-and-west streets of Trenton (23rd, 24th, 25th and 26th streets) north of Rainbow Bridge, and three east-and-west streets (19th, 20th and 21st streets) south of Rainbow Bridge, are closed to traffic by reason of the railroad cut and embankments thereof.  In other words, between the north city limit and Mable Street crossing, a distance of 2880 feet, or more than a half mile, there is no crossing for vehicles or pedestrians across defendant's tracks, except the overhead bridge at 22nd Street, known as Rainbow Bridge.  The switch-yards, depot, round-house and enginemen's wash-room of defendant are located approximately from 1800 feet to 3320 feet southeasterly from Rainbow Bridge.  Deceased, Clyde Kidd, was struck by defendant's passenger train No. 57, south-bound into Trenton, at a point on the easterly rail of the westerly track about 200 to 215 feet south of Rainbow Bridge, and approximately 325 feet north of the south end of the curve, and about 800 feet north of Mable Street crossing and the south end of the railroad cut.

On the morning of October 24, 1922, defendant's freight train, south-bound from Allerton, Iowa, to Trenton, Missouri, and consisting of 73 cars, some of which were loaded with freight shipments originating outside of the State of Missouri and in process of transportation to points outside of the State of Missouri, and hence in interstate commerce, was being pulled by locomotive engine 3002.  At Tindall, a telegraph station a few miles north of Trenton, engineer Ellis of engine 3002, received a train order to run the train down the most eastern

track at Trenton.  When engine 3002 reached the Q. O. and K. C. railway crossing, north of the north city limit of Trenton, at about 3:25 A. M., it was out of water, practically out of coal and the steam was so low the engine was practically useless.  Engine 3002 was then cut off from the train, taken to the round-house, where it was given coal and water, and then taken back and coupled onto the train.  Finding it useless to try to start the train because of the tonnage and up-grade, engineer Ellis whistled for the switch-engine, which came after about an hour, and engine 3002, with the help of the switch-engine, pulled the train to a point where the pilot of engine 3002 was about 200 to 215 feet south of Rainbow Bridge, where the engine stalled because it was again out of steam.  The switch-engine was then cut off, and engine 3002 with its train of 73 cars was left standing on the east track at five o'clock in the morning, with the pilot of engine 3002 some 200 to 215 feet south of Rainbow Bridge, where it remained stationary until some time after the fatality in question, which ocurred at 6:35 A. M.  While engine 3002 was thus stalled, engineer Ellis and fireman Dotson were attempting to get the steam up so as to proceed with the train into the Trenton terminal.  On the morning in question, the main throttle and also the drifting throttle, or valve, of engine 3002 were both leaking steam badly.  Engineer Ellis made two or three unsuccessful attempts to shut off the drifting throttle while the engine was thus standing on the east track and, in order to prevent a condensation of the steam and the consequent filling of the cylinders of the engine with water, he found it necessary to leave the cylinder cocks open, thereby permitting the steam to escape from the cylinders.  The grates of engine 3002 were also out of order, so that they could not be shaken, making it necessary to turn on the blower, the purpose of which is to create a draft through the flues and grates and thereby make a hotter fire.  The escaping steam from the cylinder cocks made a hissing noise and the

use of the blower made an additional noise. In order to get up steam, the fireman of engine 3002 was putting in fresh, green coal at intervals, causing more or less black smoke to be emitted from the engine. Work reports, covering the period from October 1st to 30th, inclusive, 1922, were admitted in evidence showing various repairs requested to be made to engine 3002 by the engineers operating the engine, and in turn made, or reported to have been made, by the mechanical department of defendant pursuant to such requests. Such work reports tended to prove the existence, at intervals during October, of steam leaks and defects in the engine similar to those which existed on the day of the fatality. Defendant, however, offered evidence that the steam leaks and shaker trouble of engine 3002 developed after the engine had started upon its round trip to Allerton, Iowa, on the morning of the preceding day.

While the freight train pulled by engine 3002 was thus stalled on the east track of defendant's double-track railroad within the corporate limits of Trenton, another and second freight train, south-bound into Trenton, pulled by engine 3022, came in on the same east track and stopped 150 to 200 feet north of and behind the stalled train. The deceased, Clyde Kidd, was the engineer of engine 3022. This second freight train left Eldon, Iowa, on the evening of October 23, bound for Trenton. It consisted of 62 cars bearing shipments from points outside of the State of Missouri to points within and outside of the State of Missouri, and hence was engaged in interstate commerce. At Tindall, the engineer and conductor of the latter train were handed the following message from the chief train dispatcher: "Trenton, 10/24/22. Extra 3022 West. Look out for west-bound train stopped on eastward track between Tindall and Trenton. If your time catches you tie up and will protect your train both ways. If get to Trenton Hill and have time take engine to house." Interpreting this message, it meant to look for the train drawn by engine 3002 on the east track ahead of the latter train and, if the

sixteen hours of service caught the crew of the second train before they reached the yards in Trenton, then they were to tie up the train and be released from duty. The second freight train pulled in on the east track behind the first train and stopped at six o'clock on the morning of October 24th. The sixteen consecutive hours of service of the crew of the second train, prescribed by the Federal statute (U. S. Compiled Statutes, sec. 8678), expired at 6:15 o'clock, at which time, pursuant to the Federal law and the train dispatcher's message, the crew were released from further duty and tied up the train. Conductor Guile of the second train, with his two brakemen, left their train and walked along the right-of-way to the yard office, some distance southeasterly, for the purpose of registering. When conductor Guile reached the caboose of the train ahead, he called conductor Malone of the first train and the two walked together to the yard office to register. It appears from the evidence that the two brakemen walked south on the westward track until they had passed engine 3002, when they crossed over the space between the tracks and walked on the eastward track. Conductors Guile and Malone likewise walked together on the westward track until they had passed through the steam escaping from engine 3002. Malone testified they walked on the westward track "to keep from getting too close to the steam." Conductor Guile testified it was a usual and ordinary part of a trip for the train crew to walk in from the train under such circumstances to the yard office and register, and that the engine crew at such times usually walked in to the round-house.

The proof shows that conductor Guile and fireman Breitenbucher of the train pulled by engine 3022 were allowed time and pay, equivalent to fifty miles, for walking in from the train to the yard office and round-house in Trenton. Fireman Breitenbucher testified that, at the direction of defendant's official time-keeper, he had prepared the time slip of the deceased engineer, Kidd, al-

lowing him "pay for fifty miles for walking in from the engine."

Shortly afterward, the crew of engine 3022 of the second train, consisting of the engineer Kidd, fireman Breitenbucher and a student fireman, Brown, carrying their clothes boxes, started to walk in to the round-house to register and change their clothing. Breitenbucher was the only one of the three who survived the fateful trip. They walked between the tracks until they reached the cab of engine 3002, when Kidd and Brown stopped for a few moments and engaged in conversation with engineer Ellis. Breitenbucher passed around them and proceeded to walk about six feet ahead of the other two, until he reached the escaping steam from engine 3002, when, to avoid the steam, he walked between the rails of the west track. After he had passed the steam, and was in the act of stepping off the track on the east side, he heard train 57 coming. He called out a warning to Kidd and Brown, but they were then being struck by train 57 at a point on the west track about even with the pilot of engine 3002, just as they were emerging from the steam. They were six or seven feet distant from Breitenbucher, whose attention was attracted by the rumbling of train 57 on the rails and a short blast of the whistle as the train was just reaching Kidd and Brown, who were thrown a distance of fifty or sixty feet and instantly killed. Breitenbucher heard no other blast of the whistle, nor did he hear the ringing of the engine bell. The reason he gave for walking on the west track around the steam was "because liable to get burned."

Engineer Ellis testified that a few seconds after he had conversed with deceased, train 57 passed his cab window. About the time the engine of train 57 reached his engine he heard the alarm whistle, two short blasts repeated. He looked out the cab window but could not see the men on the track because of the escaping steam. Does not think they had more than time enough to get to the pilot of his engine. He did not hear the approach of train 57 because of the noise of his engine; and testi-

fied that "it is customary for an engine man to walk around steam like that."

Defendant's passenger train number 57 was an interstate train bound from Minneapolis, Minnesota, to Kansas City, Missouri. This train consisted of engine 872 with tender, mail car, baggage car, smoking car, coach and three sleeping cars, seven cars in all. Its combined length was approximately 589 feet. Engine 872 was manned by engineer Kull and fireman McDonald, who took charge at Des Moines, Iowa. Engineer Kull was an extra passenger engineer and stated "most of the work I have done has been from Trenton to Kansas City, and months at a time I wouldn't get over the track between Trenton and Eldon." Train 57 was due at Trenton, according to the time table in evidence, at 3:50 A. M. and, at the time deceased was killed, was about two hours and forty-five minutes late. The average scheduled speed of the train as fixed by the time-table was 40.7 miles per hour. Engineer Kull admitted that the train was running fifty miles per hour when it passed the mile station post 2480 feet north of Rainbow Bridge, and that the train had been running at the rate of fifty miles per hour continually for some miles north of and before reaching the station post. Engineer Kull and fireman McDonald both testified that the station whistle, one long blast, was sounded at the station post, and that two long and two short blasts of the whistle were sounded at some point between the station post and Rainbow Bridge. While engineer Kull testified at the trial that the two long and two short blasts, requiring some six seconds for their sounding, were sounded near the south end of the straight track some 480 feet north of Rainbow Bridge, on cross-examination he admitted that, in a deposition taken before the trial, he had testified that this whistle had been sounded about even with the semaphore, or electric-block signal post, which, according to measurement, is 135 feet south of the station post and 2345 feet north of Rainbow Bridge. He explained this con-

flict in his testimony by saying that, when his deposition was taken, he thought the semaphore was closer to and within 200 feet of the bridge and had later discovered his error. Fireman McDonald, when asked if he knew where the two long and two short blasts of the whistle were sounded with reference to the station post and semaphore answered, "I don't believe I do." Both engineer and fireman testified that the automatic engine bell was ringing all the way from Tindall until after deceased was struck by the engine. Engineer Kull testified the train was running approximately thirty-five miles an hour under Rainbow Bridge, and that it had been the practice and custom for twenty years to run passenger trains into Trenton at that speed; that, approaching Rainbow Bridge from the north, the view of the engineer is obstructed by the curve, so that a person standing in the center of the track cannot be seen, because the engineer is on the outside of the curve. Fireman McDonald, however, who was on the inside of the curve looking ahead as the engine of the train came from under Rainbow Bridge, caught a glimpse of the three men ahead on the west track and excitedly called to engineer Kull to "whistle." The engineer whistled several short blasts and immediately applied the brakes, bringing the train to a stop so that the head end of the sixth car was about even with the pilot of engine 3002. Engineer Kull thought the stop was made in about 400 feet and fireman McDonald thought it was accomplished in 500 or 600 feet. McDonald said, "I couldn't see the men for the steam. Just got a glimpse of them at that, I never got to see them good at that." Engineer Kull did not know of the impending danger until he heard the warning yell from the fireman and had no information about the steam escaping from engine 3002.

Testimony was adduced on behalf of plaintiff tending to prove that, while the usual station whistle was sounded by the engine of train 57 at or near the station post, plaintiff's witnesses heard no other whistle sounded until the train had reached, or was passing under,

Rainbow Bridge. One of the witnesses, Lowell Harding, testified he was standing on Rainbow Bridge at the northwest corner and watched train 57 approach Trenton from a distance of two miles north of town along the straight track; that he heard the whistle sounded at or about the mile post, north of town, but heard no other whistle sounded, except "two short blasts of the whistle just as she was leaving Rainbow Bridge, as she passed under the bridge. I noticed the passenger train coming from the north about 6:30 and watched them coast into town, had shut off, I judge, about the bridge and as they passed under the bridge I looked south and noticed three men on the track and there was two short blasts of the whistle sounded, I judge, about as he was under the bridge, and the train was stopped and I found there was two men killed. It looked, when I noticed the men, they was in the center of the track, three men, and they was standing in the steam. I could see them in the track from the bridge." The evidence tended to show that the noise occasioned by the use of the blower and the escaping steam of engine 3002 was considerable, and some of plaintiff's witnesses expressed the belief that the noise was sufficient to drown the sound of the approaching passenger train and the engine bell, but that it might not drown the sound of the whistle. Several witnesses testified that the steam escaping from engine 3002 arose to the height of ten or twelve feet, mingled with the smoke of the engine, and was blown westwardly across the tracks to the west embankment of the cut, thereby tending to obscure the view of persons and objects within or beyond the steam. Most of the witnesses estimated the speed of train 57 at Rainbow Bridge at from thirty to forty miles an hour. The evidence tended to show that it was customary for passenger trains to run within the limits of Trenton, at or about the point of the casualty, at a speed of thirty-five to forty miles per hour, and that fact was generally known by employees of defendant. Also, that the usual or customary whistling point for

Mable Street crossing was at, or about, the beginning of the curve from 300 to 480 feet north of Rainbow Bridge. There was evidence of user of defendant's right-of-way from Mable Street crossing north to the city limit of Trenton by both the general public and railway employees, and that the persons so using the right-of-way and tracks "walk wherever it is the best walking, the smoothest." Several witnesses testified that the public and trainmen who thus used defendant's tracks owed a duty to look out for trains and that it was the custom and practice of defendant's employees to so look out for trains. It also appeared that deceased had notice, by reason of train order dispatches delivered to him on the morning in question, that train 57 was late and had not passed and that, at the time of his death, he carried a time table showing the schedule time of trains. The distance between the two tracks south of Rainbow Bridge is 8.9 feet and the distance between the rails of each track is 4 feet 8½ inches. Plaintiff offered evidence that a man standing between the two tracks looking north from a point 215 feet south of Rainbow Bridge, with a freight train standing on the east track, could not see over 75 to 100 feet beyond and north of Rainbow Bridge, because of the curve and the freight cars then standing on the east track.

Plaintiff alleged in her petition and proved the existence, at the time in question, of an ordinance of Trenton providing that "any person being the engineer, conductor, employee or other person having any railroad train under his control in the city, who shall run or cause or permit to be run any such train within the corporate limits of the city, at a greater rate of speed than twelve miles per hour, shall be deemed guilty of a misdemeanor, and punished by a fine of not less than twenty-five dollars, nor to exceed one hundred dollars," and also a time-table rule of defendant that "maximum speed limit as shown below must not be exceeded. Other speed restrictions must be fully complied with. Engine men must use good judgment and handle trains at speed that will

insure absolute safety. Trenton, ten miles per hour.''
Another rule of defendant in evidence was Rule 14-n, as
follows: "14. Engine whistle signals. Note—the sig-
nals prescribed are illustrated by 'o' for short sounds;
'——' for longer sounds. The sound of the whistle should
be distinct, with intensity and duration proportionate to
the distance signal is to be conveyed. (n)—— —— o o
approaching public crossings at grade and obscure
places.'' Defendant's book of rules prescribed: "Obed-
ience to the rules is essential to the safety of passen-
gers and employees, and to the protection of property.''
Several witnesses for defendant testified that a stop of
train 57, running at thirty-five miles per hour, in from
600 to 800 feet, is a reasonably good stop, and that the
same train running at ten or twelve miles per hour, hav-
ing regard for safety of passengers, can be stopped in
about 200 feet. One of plaintiff's witnesses was of the
opinion that train 57, running between ten and twelve
miles an hour, could be stopped in fifty feet with a service
application and in twenty feet with an emergency ap-
plication, but the emergency application would likely
throw passengers out of their seats. Other facts deemed
pertinent or material will be hereafter referred to in the
opinion.

Deceased was thirty-five years of age at the time of
his death and had been in defendant's service for thir-
teen years. Plaintiff offered in evidence the American
Experience Mortality Table showing the life expectancy
of deceased to be 31.78 years. Deceased left surviving,
his widow, thirty-four years of age, and four minor sons,
aged ten, seven, and four years, and less than one year,
respectively. His health was shown to be good. He
worked most of the time, and his earnings averaged
$184 a month, which earnings he turned over to his wife,
and all of which was expended on his family, except de-
ceased's room-rent and board while out on the road.

Plaintiff's petition is a narrative recital of the facts
and circumstances leading up to deceased's death, all of
which are alleged in great detail. The petition, in sub-

stance, charges defendant with negligence in permitting its engine 3002 to become defective and to be used and operated in service while not in a reasonably proper condition and so as to emit steam and vapor, thereby causing deceased to be on the west track, obstructing his view and that of the engine crew of passenger train 57, and also that, because of the noise of the escaping steam and the use of the blower, due to defects in engine 3002, which are charged to be violations of the Federal Locomotive Boiler Act, deceased was prevented from hearing the ordinary running, operation and approach of the passenger train and the ringing of the engine bell, and thereby defendant failed to furnish and provide deceased with a reasonably safe place to work and to walk in the performance of his duties; that defendant negligently ran and operated train 57 at an unreasonable, excessive and negligent rate of speed in view of the existing facts, circumstances and conditions, which were visible to the engine crew of train 57, and at a speed of about forty miles per hour in violation of the ordinance of Trenton and the time-table rule of defendant, and negligently failed to have said train and engine under reasonable and proper control, and negligently failed to anticipate the presence of deceased at a point on the tracks alleged to have been customarily used by employees and the public, and negligently failed to keep a reasonable lookout for the safety of persons on and along the tracks, and negligently failed to sound the engine whistle at frequent and reasonable intervals while within the railroad cut and approaching the curve and within reasonable hearing distance of deceased, or give deceased reasonable warning or signal of the approach and movement of said passenger train. The answer denied generally the allegations of the petition, and alleged that deceased's death was caused by his own negligence and was due to the risk of his employment by him assumed. The reply denied generally the new matter of the answer. Verdict and judgment were for plaintiff for $30,000, from which defendant appeals.

I.   First and foremost, it is contended by appellant that plaintiff failed to make a case for the jury and that defendant's demurrers, offered at the close of plaintiff's evidence and again at the close of all the evidence, should have been given.   Expressing appellant's contention in the language of its brief, it is that, ''while the record shows numerous acts and omissions in themselves constituting negligence on part of defendant, the record fails to show any negligence of which deceased could complain, that is to say, it fails to show any actionable negligence in this case.''   It is strenuously asserted that the defective condition of engine 3002, with respect to its emission of steam and attendant noise, and the speed of train 57 were mere *conditions* and were no more *causes* of the fatality than was the lateness of train 57 or the expiration of the sixteen-hour prescribed period of service of deceased.

Proximate
Cause.

(a)  Did the use of engine 3002, in its then condition, render defendant liable for injury proximately resulting from its use?  If so, was engine 3002, with its escaping steam and unusual noise, a proximate and contributing cause of the fatality?

As to the first question, plaintiff charges that the use of engine 3002 in its then condition was a violation of the Federal Locomotive Boiler Act, as amended in 1915. That act originally makes it unlawful for any common carrier, its officers or agents, ''to use any locomotive engine propelled by steam power in moving interstate or foreign traffic unless the boiler of said locomotive and appurtenances thereof are in proper condition and safe to operate in the service to which the same is put, that the same may be employed in the active service of such carrier in moving traffic without unnecessary peril to life or limb,'' and the amendment makes the act ''apply to and include the entire locomotive and tender and all parts and appurtenances thereof.''   [U. S. Compiled Statutes, secs. 8631 and 8639a.]

The record shows that, on the morning of the fatality, engine 3002 was not in proper condition with

respect to both its drifting throttle and grate shaker, necessitating the opening of the cylinder cocks, thereby permitting an unusual amount of steam to escape, and also necessitating the use of the blower, thereby adding to the noise of the escaping steam. This condition, according to engineer Ellis, existed while the engine stood on the east track about 200 feet south of Rainbow Bridge for an hour and a half before deceased received his fatal injury, or between five and 6:35 o'clock. The record is silent as to whether any effort was made by engineer Ellis to procure another engine, or whether another engine was at the time available, for the purpose of pulling the train into the terminal. However, it does appear from the record that the engine round-house, and the chief dispatcher's office (located in the yard office) were but a half mile away and that a rule of defendant in evidence provides: ''Accidents, detention of trains, failure in supply of water or fuel, or defects in power, track, bridges or signals, and other conditions affecting operation or safety of trains must be reported to Chief Dispatcher. These reports must be in writing, be promptly filed and transmitted.''

In Kilburn v. Railway Co., 289 Mo. 75, this court had under consideration the Boiler Act, as amended, and therein said: ''The Boiler Act, as amended in 1915, prohibits a locomotive, disabled in any of its parts, to be used in interstate commerce, if such use might occasion peril to life or limb. It is true there is no showing that this engine and all its parts were not in proper condition when it started upon the interstate journey, but the statute does not limit the duty as to condition to the time of starting. It prohibits the use of an engine out of condition in interstate commerce, and it can make no difference when that unfit condition arises. And this prohibition is not only against the carrier, but also against 'its officers and agents.' The engineer with this engine at Liberty, Missouri, was at least an agent in charge of this engine, if in fact he was not the *alter ego* of the carrier. . . . The use of the disabled engine from

Liberty to Laredo was a matter which might have been averted by the engineer, the agent of defendant. To say the least, if by its condition (and concededly it was not in proper condition) there was unnecessary peril to either life or limb, it was a violation of the law to use it.''

In a later case, involving the Safety Appliance Act, Wolfe v. Payne, 294 Mo. 170, we held: ''The plaintiff's case coming under the said Safety Appliance Act, it was sufficient that plaintiff prove the existence of the defective grab-iron and that it was in part the cause of plaintiff's injury. It was not necessary to prove negligence on the part of the carrier in maintaining said grab-iron in a secure condition; its duty to do so was imperative and absolute.'' We conclude that defendant is liable for the use of engine 3002 in its then condition, provided that its use was in part a proximate cause of deceased's injury.

As to the second question, that of proximate and contributing cause, it appears from the record that an unusual amount of steam was, by reason of the aforesaid condition of engine 3002, caused to escape from the cylinder cocks, accompained by a loud and unusual noise, accentuated by the use of the engine blower. Also, that this steam, commingled with the smoke of the engine, was blown westwardly across the westward track to the embankment on the west side of the cut, tending to obscure the vision of one walking in the steam, or south thereof, and also the vision of the enginemen of train 57. The evidence also tends to show that the escaping steam created an apprehension, at least, in the minds of several employees of defendant that the steam would likely burn one walking by the engine, if between the two tracks, and that, in order to avoid the apprehended danger, they walked on the westward track to avoid being burned by the steam, adopting precisely the same course as did Kidd, the deceased. Engineer Ellis testified ''it is customary for an engine man especially to walk around steam like that.''

In Shafir v. Sieben, 233 S. W. 419, this court, in Banc, considered the question of proximate cause where a plaintiff, meeting with an obstruction negligently placed by one defendant on a sidewalk and extending almost to the center of the street, was thereby caused to pass around the obstruction onto the roadway of the street used for vehicular traffic, where he was injured by an automobile owned and negligently operated by another defendant. Said this court: ''It seems to be assumed by both parties that the question considered by the trial court in sustaining a general demurrer to this petition was that, whatever may have been the rights of the parties with reference to the obstruction in Fifteenth Street to which the plaintiff attributes his injury, it was not the proximate cause of the injury, which resulted from the negligent operation of an automobile belonging to Sieben and operated by Smiley, original defendants in this case, against whom it was dismissed. . . . The cause of the injury in this case necessarily consisted of two elements: (1) The presence of the plaintiff in the path of the automobile which struck him; and (2) the blow it delivered against his body. Both of these causes were present and in full operation at the instant of the injury. According to the allegation of the petition, his presence was due to the wrongful act of these defendants, and the blow was delivered by the wrongful act of the driver of the machine. Neither would or could have occurred without the operation of the other at the same time. Both were commingled in the single act of the injury. The argument by which it is attempted to separate them is specious and artificial.'' The same conclusion was reached by the Kansas City Court of Appeals in Daneshocky v. Sieble, 195 Mo. App. 470, and Adelman v. Altman, 209 Mo. App. 583.

It seems to us that the principle enunciated by this court in Shafir's case is none the less applicable to the case at bar. Here, the obstruction and the blow were both caused by the act of a single defendant, acting through different agents, but resulting in the one injury.

There, the obstruction was caused by one defendant and the blow by another, but both resulted in the one injury.

In Southern Railway Company v. Webb, 116 Ga. 152, a passenger on one of defendant's cars was suddenly thrown by a negligent jerk or jolt through the rear door of the car and across the car platform onto the track, and, while he was lying stunned upon the track, an engine of another railroad shortly afterward ran over and killed him. It was there held that defendant was reasonably bound to anticipate that one negligently thrown and left in a helpless condition in a perilous position upon its track may be injured by another engine or train thereafter using the track, and its negligence was in law a proximate cause of his death.

In City of Louisville v. Hart's Administrator, 143 Ky. 171, the driver of a wagon, because of defects in a city street rendering it unsafe for travel, was thrown from his wagon and fell on a street car track immediately in front of an approaching car running at a dangerous and negligent rate of speed and was run over and killed by the car. Said that court: ''We have then two approximately concurring acts of negligence by two independent agencies that brought about his death. Neither act of negligence in itself, without the co-operation of the other, would have harmed him. On the one hand, however fast the car was going, unless he had been thrown in front of it, he would not have been killed. On the other hand, although thrown on the car track by the bad street, he would have escaped death if it had been prudently operated. The question now is, which of these acts of negligence was the proximate cause of his death. We think that both of them may be so treated. Two agencies, acting entirely independent of the other, as in this case, may jointly and concurrently be the proximate cause of an injury, when it would not have happened except for the concurrence at approximately the same time and place of the two negligent acts.''

Ordinarily, the question of proximate cause is one for the consideration of a jury. In Milwaukee & St.

Paul Railway Company v. Kellogg, 94 U. S. 469, it is said: ''The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it. . . . In the nature of things, there is in every transaction a succession of events, more or less dependent upon those preceding, and it is the province of a jury to look at this succession of events or facts, and ascertain whether they are naturally and probably connected with each other by a continuous sequence, or are dissevered by new and independent agencies, and this must be determined in view of the circumstances existing at the time." Of similar purport is Davis v. Wolfe, 263 U. S. 239. The rule is followed by our own court (Hood v. Railway Co., 259 S. W. 471; Laughlin v. Railway Co., 275 Mo. 459), and also by our courts of appeals (Johnson v. Construction Co., 188 Mo. App. 105; Gilman v. Fleming, 265 S. W. 104.)

We think there was substantial evidence tending to prove that the defective condition of engine 3002 was a proximate and contributing cause of deceased's injury and that issue was properly submitted to the jury.

(b)  Was defendant negligent in running train 57 at a speed in excess of that prescribed by ordinance and its own rule, and, if so, was the speed of train 57 a proximate and contributing cause of deceased's death under the facts in evidence?

**Excessive Speed.**

It is undisputed upon the record that there was in force at the time of the fatality an ordinance of Trenton limiting the speed of railroad trains to twelve miles per hour and that there was also in effect at that time a rule of defendant providing that a maximum speed of ten miles per hour in Trenton must not be exceeded, and that such rule was promulgated for the safety of employees as well as passengers, as evidenced by another rule to the effect that ''obedience to the rules is essential to the safety of passengers and *employees*.'' Engineer Kull of train 57 admits that the train was traveling about

thirty-five miles an hour while passing under Rainbow Bridge, and all of the witnesses fix the speed of the train at from thirty to forty miles an hour. It is unnecessary to cite authorities to the effect that the violation of a speed ordinance or railroad rule is negligence *per se.* The reports are replete with such rulings. Nor can it be said that the speed ordinance is limited in its application to streets and public highways and not to defendant's right of way and railroad yards. [Davison v. Hines, 246 S. W. 295.]

Nor can we say that there was no substantial evidence tending to prove that the negligent speed of train 57 was a proximate and contributing cause of deceased's injury. It appears from the testimony of defendant's own witnesses that the train could have been stopped in about 200 feet if traveling at ten or twelve miles per hour, within the speed requirements. One of plaintiff's witnesses testified it could have been stopped in fifty feet with a service application. The point of collision with deceased was from 200 to 215 feet south of Rainbow Bridge and the fireman of train 57 testified he first saw the men on the track "just as coming from under the the bridge" and, at the first glimpse of the men, he warned the engineer. The engineer testified that he stopped the train in approximately 400 feet from where he heard the fireman's warning under the bridge, and this in view of the fact that upon his own testimony the train was traveling under the bridge at approximately thirty-five miles per hour, almost three times the ordinance speed. Deceased's companion, Breitenbucher, who was about six feet ahead of deceased, had time to step or jump from the track and avoid injury.

In Rigley v. Pryor, 290 Mo. 10, we said: "Another act of negligence alleged was the excessive speed. The appellant claims the speed of twenty-five miles an hour was not the proximate cause of the collision, because it is not shown that it could have been avoided if the train had been running at a lower rate of speed. It is pure

assumption to say that a train running at half the speed would have caused the same injury, or one like it. If the train had been running at half the speed from the time it crossed the river, the hand-car would have been to its destination and off the track. If not, the men on the hand-car would have had double the time in which to jump for their lives after they saw the train appearing in the fog; the force of the collision, if there had been one, would necessarily have been much less. It was a question for the jury as to whether an excessive rate of speed was the cause of the injury.''

We think the issue of negligent speed of train 57 as a proximate and contributing cause of the injury was a proper question for the jury under all the existing facts and circumstances.

(c) Was the alleged negligence of defendant in failing to have train 57 under reasonable control under the existing circumstances and in failing to keep a reasonable lookout for deceased and give him timely warning by whistle of its approach an issue properly to be submitted to the jury? We think so. The *locus in quo* was a three per cent curve in a deep cut, shown by the record to have been used to some extent, at least, by the general public as a passageway between Mable Street crossing and the north city limit of Trenton. Residents living near defendant's right-of-way in the north part of Trenton more or less frequently walked over and along the right-of-way and tracks. There is one pathway, or more, leading down the west embankment near Rainbow Bridge into the cut and used by the public in entering the cut. Skating and fishing parties of young people at times used the right-of-way as a passageway to a small lake north of town. The place of injury was within the yard limits of defendant and railroad trainmen at times, when necessary, used the right-of-way and tracks as a passageway when walking from their trains to the yard office and round-house. The two freight engines 3002 and 3022

*Reasonable Control: Warning Signals.*

with their 135 cars standing upon the east track at the time, we think, should have indicated to the engine crew of train 57 that there might be trainmen upon or about the tracks in the vicinity of the curve. The curvature of the west track at or under Rainbow Bridge was such that, according to engineer Kull's testimony, "it wouldn't permit the engineer to see. A person standing in the center of the track, I doubt whether he could be seen by the engineer around in front of the engine." Defendant's Rule 14-n in evidence required two long and two short blasts of the engine whistle to be sounded when approaching obscure places. The rule does not define "obscure places." Several witnesses testified that it was customary for south-bound trains to sound two long and two short blasts of the whistle, or the "crossing whistle" as some witnesses called it, for the curve north of Rainbow Bridge and for Mable Street crossing. Engineer Kull and fireman McDonald of train 57 both testified that the usual station whistle of one long blast was sounded at the station post and that the crossing whistle of two long and two short blasts was sounded at some point north of and before the train reached Rainbow Bridge. Equally positive, however, was the testimony of other witnesses that they heard no whistle sounded after the station whistle until the train had reached or was passing under Rainbow Bridge. One of these witnesses stood upon Rainbow Bridge watching train 57 approach from a distance of about two miles north of Trenton and, therefore, was in a position to observe and note whether the whistle was sounded approaching the curve.

In Greenwell v. Railway Co., 224 S. W. 404, this court said: "The negligence alleged in the petition was the running of its road engine by defendant along the track, where the plaintiff was injured, without warning of any kind to apprise the plaintiff of its approach. In determining whether any duty devolved upon the defendant to keep a lookout ahead, and warn employees passing along the tracks of the approach of the engine,

depends upon whether the employees in charge of the engine had a right to expect a clear track at that point. [Citing authorities.] This case is not like those where it is held that a section hand, or some employee working on the track, is expected to look out for himself and take note of the passage of engines and trains. The plaintiff in this case had come in off his run and was going along an accustomed way, from where he had left his engine on the engine track, to the depot, where he was to sign for a new bulletin. Employees were obliged to pass, and frequently were passing, along the place where the plaintiff went, in the discharge of their duties, and were to be expected along that way. . . . Where employees are expected to be passing across tracks such as the plaintiff crossed in this case, it is the duty of those running trains or engines along that way to look out for danger to such persons and give appropriate warning to prevent injuring them.''

In Hunt v. Railroad Co., 259 S. W. 481, we had under consideration the effect of a defendant's Rule 920, which provided that the ''road crossing whistle must be sounded, before passing around curves, where the view is obscure.'' We there said: ''But in view of the evident danger, not only to the employees of the railroad company, but to the passengers also, whether such employees, on the track, could rely on such whistle being sounded or not did not make it less the duty of the engineman to comply with said Rule 920, and their failure to do so was evidence of negligence for which defendant was responsible to all persons injured thereby, including track employees. . . . In our opinion, therefore, there being abundant evidence, indeed it is practically undisputed, that no crossing whistle was sounded before passing over the curve in the track, as required by said Rule 920, there was a case for the jury under said rule, and defendant's demurrers to the evidence were properly refused.'' Similar in effect are Dixon v. Railroad, 109 Mo. 413, and Rigley v. Pryor, 290 Mo. 10.

In Hubbard v. Railroad Co., 193 S. W. 579, an action for personal injuries to a laborer employed at a rock crusher along defendant's right-of-way, we said: "The plaintiff having been lawfully upon the tracks of the defendants, and their agents and servants having had actual knowledge as well as constructive notice of that fact, as well as the continuous occupancy of the same by him and other employees of the crusher company, imposed upon the defendants the duty to keep a lookout for the plaintiff and his co-laborers while their trains approached and passed the crusher, and to use all reasonable care at their hands not to injure him. And there was evidence tending to show that the train which struck and injured plaintiff approached the crusher at a high rate of speed without ringing the bell or sounding the whistle, or giving any other warning of its approach. Under the authorities that was negligence. . . . The surest and safest way to have warned and protected the employees of the crusher of and from danger of approaching trains was to slow down the speed thereof, and to ring the bell and sound the whistle of the engine, which the evidence for the plaintiff tended to show was not done upon the occasion of this injury. . . . Sounding a whistle at a distance so far removed from the point of danger, in a place where it is not likely to be heard on account of physical obstructions, is not a full performance of duty by those in charge of a train of cars."

Appellant argues that the record fails to show that a whistle, if sounded north of the bridge for either the curve or Mable Street crossing, could have been heard by deceased above the noise of engine 3002. That matter, however, was one for the jury to consider. As we said in Rigley v. Pryor, 290 Mo. 10: "It is possible that the noise of the hand-car and the confusion of sounds caused by the train which had just passed may have prevented those on the hand-car from hearing the bell, or, if they heard it, from locating its direction; but all that was for the jury to consider in determining whether

proper care was exercised.'' The same is true of appellant's argument that the short blasts of the whistle heard by plaintiff's witnesses at or under the bridge were the concluding blasts of the customary crossing whistle and not the sounds of the alarm whistle given when engineer Kull was first warned of deceased's presence on the track. That matter was likewise one for the consideration of the jury.

We are of the opinion that the evidence tended to show that the curve north of Rainbow Bridge was an obscure place within the meaning of defendant's Rule 14-n, that engineer Kull did not have a right to expect a clear track, and that, therefore, the issue whether defendant negligently failed to have train 57 under reasonable control and negligently failed to keep a reasonable lookout for deceased and give him timely warning by whistle of the train's approach under all the existing circumstances and conditions was properly one for the jury.

(d)   But appellant finally contends that it cannot be charged with negligence in failing to anticipate the unusual and untoward series of circumstances which led up to deceased's fatal injury, and, therefore, de-

Anticipated Injury.

fendant comes within the rule, announced by this court in American Brewing Assn. v. Talbot, 141 Mo. 674, and Fuchs v. St. Louis, 167 Mo. 620, to the effect that ''it is not negligence not to take precautionary measures to prevent an injury when the injury could not reasonably have been anticipated and would not, except under exceptional circumstances, have happened.'' That, however, is not the exact situation here, for defendant's agent, engineer Ellis, in using the defective engine 3002, could reasonably have anticipated that the escape of an unusual amount of steam therefrom would cause trainmen to pass around the steam to avoid the apparent danger therefrom and walk upon the west track where trains were likely to be run at any time, and defendant's agent, engineer Kull, could reasonably have anticipated that running train 57 around the curve

and in the cut, with knowledge of the user of the tracks by trainmen and the public, at an excessive speed and without timely warning by whistle might result in injury to one upon the railroad track. [Adelman v. Altman, 209 Mo. App. 583; Southern Railway Company v. Webb, 116 Ga. 152.] As we said in Buckner v. Horse & Mule Co., 221 Mo. 700, "it is not essential that defendant could have anticipated the very injury complained of, or that it could have anticipated that it would have occurred in the exact manner in which it did occur, but it is suffi- cient if the negligence of the defendant was the proximate cause of the injury." [See, also, Gilman v. Fleming, 265 S. W. 104.]

In our opinion, defendant's demurrers to the evi- dence were properly overruled by the trial court and that assignment is ruled against appellant.

II.   Appellant claims that deceased's injury was due to the risk of his employment, which he at all times as- sumed.   Following the rule theretofore established by a long line of cases in this State, in Williams v. Pryor, 272 Mo. 613, a case under the Federal Employer's Liability Act, involving the use of a simple tool by the injured employee, we held that it is negli- gence on the part of the master not to furnish the servant a reasonably safe tool, and that the servant does not as- sume the risk growing out of the master's negligence; that the use of such a tool by the servant is nothing more than contributory negligence, which is not a complete defense or bar under the Federal act.   On *certiorari,* however, the Federal Supreme Court in Pryor v. Wil- liams, 254 U. S. 43, reversed our ruling, and, it appearing as an indisputable fact in that case that the defect in the tool was so obvious to the employee that the most cursory and superficial inspection would have disclosed it, that court held the use of the obviously defective tool amounted to assumption of the risk on the employee's part, which, under the Federal act, controlling upon the State courts, is a complete defense on the part of the

master.   However, even under the doctrine of true as-
sumption of the risk, it is the rule of our State courts that
the servant does not assume the risk unless the danger or
risk occasioned by the master's negligence is so glaring
and obviously apparent to the servant as to threaten
imminent danger; or, stating it a little differently, unless
the danger occasioned by the master's negligence is so
obvious that an ordinarily prudent person under the
same circumstances would have observed and appreciated
it.   If, as here, there is substantial doubt upon that ques-
tion, it is one of fact for the jury.   [Thorpe v. Railway
Co., 89 Mo. 650.]   And such is the rule of the Federal
courts.   [Erie Railroad Co. v. Regan, 297 Fed. 435; Gila
Valley Railway Co. v. Hall, 232 U. S. 1. c. 102; Director
General v. Templin, 268 Fed. 483.]   We do not think the
danger here was so obvious as to warrant us in ruling
that deceased assumed the risk as a matter of law, and
the question was therefore one for the jury under proper
instructions.   It appears from our examination of the
instructions that the jury were properly instructed upon
that issue and their verdict thereon is conclusive and
binding upon us.

III.   Was deceased negligent and, if so, was his
negligence the sole proximate cause of his death?   In
discussing this question, it must be borne in
mind that contributory negligence, under the
Federal Liability Act (Comp. Stat. sec. 8659),
does not bar a recovery, but damages shall be diminished
by the jury in proportion to the amount of negligence at-
tributable to the employee, unless the carrier has violated
a statute enacted for the safety of employees and such
violation contributed to the employee's injury or death,
in which case the employee shall not be held guilty of
contributory negligence.   Therefore, unless deceased
was negligent and unless his negligence, as a matter of
law, was the sole proximate cause of his death, his con-
tributory negligence, if any, was a question for the jury
to be taken in connection with the assessment of dam-

ages under proper instructions, which it appears were given to the jury in this instance. Appellant contends it was the primary duty of deceased to be on the lookout for an approaching train on the west track and to protect himself from injury; that he could only discharge that duty by looking north, not only from a point between the tracks, but from a point farthest west on the west rail of the west track and, had he done so, he could have avoided injury.

The only evidence in the record as to the distance a view of the west track northward might have been had was that of plaintiff's witness Smith, who testified that from a point about 215 feet south of Rainbow Bridge midway between the tracks, with a freight train on the east track, the view of the west track towards the north was not over seventy-five to one hundred feet beyond the bridge at the outside. No evidence was offered by defendant as to the extent of the view northward, either from between the tracks or from any point upon the west track. Counsel for the respective parties, from mathematical calculations, of which the jury apparently did not have the benefit, so far as the record shows, respectively argue that deceased could, and could not, have seen the approaching train had he looked north before entering the steam at a point opposite the gangway of engine 3002 and on or between the rails of the west track. Respective parties have calculated the point of vision to a mathematical nicety, but, from the evidence in the record here, we are unable to say as a matter of law that the engine of train 57 was visible to deceased had he looked north at the place and at the time he entered upon the west track. Fireman McDonald, of train 57, was the only one of the crew of that train who saw deceased and his testimony indicates that, when he first caught a glimpse of deceased and his companions as the engine was coming from under the bridge, they were then within the escaping steam. "Q. Well, you never saw the three men at all until you saw them *while they were in the steam,* did you? A. No, just got a glimpse of them at

that, I never got to see them good at that.'' While the question is close, we think it was for the jury to say, in passing upon deceased's contributory negligence as a question of fact, whether deceased could have caught a glimpse of the approaching engine had he looked when entering upon the west track.

In Pennsylvania Railroad Company v. Crouse, 286 Fed. 376, the Federal Circuit Court of Appeals for the Sixth Circuit said: ''There is no rule of law which imperatively makes it negligence for a licensee, walking along a railroad track, to neglect to look back during a period of six or eight seconds, if the track behind him was clear when he entered upon it.''

Besides, there is no evidence in the record from which we may reasonably infer that deceased did not look for an approaching train before he entered upon the west track. All the witnesses interrogated upon this matter answered that they did not know whether he looked or not. In Hunt v. Railroad Company, 259 S. W. l. c. 487, we said: ''There is no presumption that Hunt, before the engineer saw him on the tracks, did not look and listen, with due diligence, both ways, as the law and the rules required him to do, for all approaching trains. . . . He is dead, and the presumption is he exercised due care, unless and until there is evidence to the contrary. [Burtch v. Railroad, 236 S. W. l. c. 340, and cases cited; Weller v. Railway, 164 Mo. l. c. 204, 205; McDaniel v. Hines, 292 Mo. 401.]''

Nor does the fact that deceased knew, by reason of train dispatches delivered to him, that train 57 was late, convict him of contributory negligence as a matter of law. At 6:35 A. M., the time of the fatality, train 57 was actually running into Trenton two hours and forty-five minutes late. None of the train dispatches delivered to deceased indicated that the train was running as late as two hours and forty-five minutes behind its scheduled time. From all information deceased had, train 57, although late, should have arrived in Trenton before that time and, assuming he did know the train had not ar-

rived, the distance of the train from Trenton at that time would have been mere conjecture upon deceased's part. At least deceased had no information, other than that the train was late, to lead him to believe that the train was in such close proximity to the scene of the fatality. That fact, we think, was an element to be considered by the jury in passing upon deceased's contributory negligence.

In Dixon v. Railway Co., 109 Mo. l. c. 427, we said: "The court is authorized to pronounce certain conduct negligent only when no other construction may fairly and reasonably be placed upon it in the circumstances; but where the facts are such as would warrant a reasonable inference that ordinary care has been taken by the person in question, the issue, whether or not such care was really exercised by him, is for triers of the fact to decide."

We conclude that deceased was not guilty of contributory negligence as a matter of law. Whether he was guilty of contributory negligence, or negligence which was the sole proximate cause of his death, was a question for the jury. [Hunt v. Railroad Co., 259 S. W. l. c. 487.]

IV. Appellant assigns error in the giving of plaintiff's instructions and in the refusal of certain of its own. It is urged that plaintiff's instructions as a whole, by reason of their number, extreme length, Instructions. confusion of detail and repetition of charges of negligence, confused the jury and prevented it from passing upon any real issue in the case. No useful purpose can be served by here quoting the several instructions. They are long and somewhat involved as to detail, but are reasonably clear and not likely to have been misunderstood by the jury. Their length and minuteness of detail do not constitute reversible error. [Walter v. Missouri Portland Cement Co., 250 S. W. 587; Wolfe v. Payne, 294 Mo. 170.]

Appellant complains of plaintiff's instruction numbered 3 on the ground that it authorized the jury to convict defendant of negligence upon general grounds and irrespective of the allegations, or specifications, of the petition. We have carefully examined the instruction in conjunction with the petition and do not find that it submitted any act of negligence not alleged in the petition and not supported by the evidence. A similar instruction was challenged upon the same ground herein assigned and that instruction was approved by this court in Hubbard v. Wabash Railroad Co., 193 S. W. 1. c. 585. The giving of the instruction was not error.

General Grounds.

Plaintiff's instruction numbered 4 submits in great detail conjunctively the several alleged acts of negligence, together with the existing circumstances and surroundings, as set out in the petition. Appellant claims that it improperly set up an arbitrary standard of care in respect to sounding of whistles at intervals and in respect to the taking of engine 3002 out of service, thereby invading the province of the jury. With respect to sounding of the whistle, the instruction required the jury to believe "that under all the facts and circumstances mentioned in evidence, reasonable and ordinary care for the safety of Clyde Kidd and others on and along said track, at said time and place, required that the locomotive steam whistle on said passenger train be sounded at reasonable intervals while in said cut and while approaching said curve and said Rainbow Bridge mentioned in evidence, and within reasonable hearing distance of said Clyde Kidd, and within a reasonable hearing distance north of said bend and curve and said Rainbow Bridge." In view of the rulings of this court in Hunt v. Railroad Co., 259 S. W. 481, Rigley v. Pryor, 290 Mo. 1. c. 22, and Hubbard v. Railroad Co., 193 S. W. 579, we do not think the instruction is subject to the criticism leveled against it. With respect to taking engine 3002 out of service, the jury were required to believe from the evidence that

Arbitrary Standard: Sounding Whistle.

Kidd v. Rock Island Railway Co.

"said locomotive engine No. 3002 then and there had defective steam valves and a defective throttle valve and apparatus and that said defects, if any, then and there caused said engine to throw out, and permit to escape, a large and unusual volume of steam and vapor; . . . and that, by reason of said defects, if any, said engine was then and there not in a reasonably proper condition and not reasonably safe to so operate and use without unnecessary peril to life and limb; and . . . that ordinary and reasonable care required that the defendant acting through its officers, agents, and engineer in charge of said engine, provide and furnish another and different engine to haul said train into the Trenton yards; . . . and that defendant was negligent in so using said engine No. 3002 in its said defective condition (if any) and with the steam and vapor escaping (if any) as mentioned in evidence." This charge was proper under our holding in Kilburn v. Railway Co., 289 Mo. 75.

*Province of Jury.*

The concluding clause of plaintiff's instruction numbered 4 reads: "and, if the jury further believe from the evidence that by exercising reasonable care in the aforesaid particulars, in the running and operation of said passenger train No. 57, and in the use and operation of said locomotive engine No. 3002, defendant's employees in charge of said passenger train and in charge of said engine No. 3002 *could have kept from killing the said Clyde Kidd,* then the plaintiff is entitled to recover, and your verdict must be in her favor." Appellant insists that the instruction assumes that the alleged acts and omissions of defendant's employees were the cause of deceased's fatal injury and that the italicised clause assumes the existence of the element of causal connection essential to recovery. Appellant has apparently overlooked that portion of the instruction which immediately precedes the concluding clause and which requires the jury to believe from the evidence *"that the death of the said Clyde Kidd was directly caused, in whole or in part, by said*

*Assuming Causal Connection.*

*acts and omissions,* if any, of the defendant, without assumption of risk on his part as defined in these instructions.'' That portion of the instruction required the jury to first find that the alleged acts or omissions of defendant's employees were the direct (or proximate) cause, either in whole or in part, of deceased's injury, and that deceased had not assumed the risk of such injury. The instruction must be read and considered as a whole and not by piecemeal. When so read and considered, the instruction, we think, was clear, and not confusing, to the jury and did not assume, or lead the jury to infer, that deceased's death was caused by defendant's negligence, but, on the other hand, required the jury to find and determine that very fact.

Complaint is made of plaintiff's instruction numbered 15 on the measure of damages for the reason that it permits the jury to find that deceased was not guilty of negligence causing or contributing to cause his death. This instruction must be considered in connection with plaintiff's instruction numbered 6, which told the jury that, if they believed from the evidence deceased was exercising ordinary and reasonable care under all the facts and circumstances in evidence, then deceased was not guilty of contributory negligence and there should be no diminution of damages assessed, but if they found and believed from the evidence that deceased was guilty of contributory negligence, then the damages assessed must be diminished in proportion to the amount of negligence attributable to deceased. The jury were told that Instruction 15 on the measure of damages was to be considered with Instruction 6 on contributory negligence. In another instruction the jury were told that ''any act of deceased, in order to constitute contributory negligence, must have been negligently done, and whether deceased was guilty of contributory negligence is a question of fact to be determined by the jury under all the facts and circumstances in evidence.'' The terms ''negligence'' and ''ordinary care'' were properly defined in another instruc-

*Measure of Damages.*

tion. Whether deceased at the time of his death was guilty of contributory negligence was a proper issue of fact to be decided by the jury, and the instructions, we think, properly submitted that issue in connection with the measure of damages.

No error was committed in the refusal of defendant's instructions numbered 2, 6, 8 and 9, which sought to withdraw from the jury the consideration of the several specific charges of negligence. It was for the jury to say whether those several acts of defendant constituted negligence. We find no reversible error in the giving or refusal of instructions and the assignment is ruled against appellant.

V. Error is assigned in the admission of certain evidence. One of defendant's engineers was permitted, over its objection, to testify respecting the usual practice and custom of railroad men as to passing or walking around steam escaping from a locomotive and as to the usual, customary and proper place to sound the whistle when approaching Mable Street crossing and the curve north of Rainbow Bridge. In our opinion, no error was committed in permitting the witness to express his opinion on those subjects. [Crecelius v. Railway Co., 284 Mo. l. c. 42; Meily v. Railroad Co., 215 Mo. l. c. 589.] Another witness, in an unresponsive answer to a question, referring to the use of engine 3002 and its withdrawal from service, remarked: "If the throttle leaking the way it is described, she is liable to hurt some one." While possibly the answer should have been stricken out by the court, we do not believe the error materially affected the merits of the action (Sec. 1513, R. S. 1919; O'Neill v. Kansas City, 178 Mo. 91). The same is true as to the admission in evidence of the work reports showing various defects in engine 3002, not connected with the defects specifically alleged in the petition, during the month of October. At most, that evidence was harmless, in that the jury were limited by the instructions to the consideration of the specific defects alleged

*Custom.*

in the petition. Even though the engine had never been out of order before and the steam leaks and shaker trouble had occurred for the first time on the day of the fatality, defendant was not thereby relieved of the duty to use an engine meeting the requirements of the Federal statute. [Kilburn v. Railway Co., 289 Mo. l. c. 93.] The assignment is ruled against appellant.

VI. Appellant assigns error because the trial jury were selected from a panel of twenty instead of eighteen jurors over its objections made at the time. At the opening of the trial, a panel of twenty-four jurors was called. It appearing that four of the twenty-four were not on the list of regular and alternative jurors, Panel of but were bystanders, those four were excused. Twenty Jurors. The court thereupon announced that the trial jury must be selected from the remaining twenty, allowing to each party four peremptory challenges. Defendant again objected to the panel of twenty jurors, but the trial court overruled the objection and an exception was saved. Section 6630, Revised Statutes 1919, provides: "In trials of civil causes each party shall be entitled to challenge, peremptorily, three jurors; but when there are several plaintiffs and defendants they shall join in their challenges, and the plaintiff shall, in all cases, announce his challenges first." While our jury statute does not, in so many words, say that a panel of eighteen jurors shall be called, yet, inasmuch as a common-law jury is composed of twelve jurors and the statute provides for six peremptory challenges, three to each party, it may properly be inferred that the statute contemplates or presupposes a panel of but eighteen jurors. But, in this instance, it appears from the record that plaintiff, in first announcing her peremptory challenges, struck from the jury list the nineteenth and twentieth, as well as the twelfth and fifteenth, names, while defendant peremptorily challenged and struck off the fourth, fifth, eleventh and eighteenth names. Hence, it appears that

defendant had four, instead of three, challenges out of the first eighteen names on the jury list, while plaintiff had but two challenges therefrom. It does not appear from the record that any one of the twenty jurors on the panel was not qualified, nor did defendant offer any objection upon that ground. It is true that there were three alternates among the first eighteen names on the jury list, but no showing is made that the three alternates were not legally qualified jurors. If any harm befell defendant by reason of the manner of selection of the jury it has not been made apparent to us. No bias or prejudice of any juror is shown or suggested. Neither does it appear that the verdict would have been otherwise had the panel consisted of but eighteen regular jurors. The privilege of challenge is the right to reject and not the right to select. [Rees v. Railroad, 156 Mo. App. l. c. 59.] "Unless there is plain evidence of injustice done to the party complaining, the verdict should be allowed to stand." [1 Thompson on Trials (2 Ed.) sec. 116.] While the assignment in this instance is ruled against defendant because no injury or injustice appears to have resulted, we feel it our duty to say, by way of warning, that trial courts should follow the long established practice of selecting a trial jury from a panel of eighteen jurors, as seems to have been contemplated by the statute. Our State Constitution preserves inviolate the right of trial by jury, and our courts have always protected that right whenever the cause is properly triable by a jury. We can conceive of instances where injury and injustice might be done litigants in departing from the established practice, in which instances we would not hesitate to award another trial upon the slightest evidence of injury or injustice. Hence, this note of warning to the trial courts.

VII. The verdict assessed damages at $30,000. Appellant contends that the verdict is excessive and we are inclined to that view. While it is a harsh duty on our

Kidd v. Rock Island Railway Co.

Excessive
Verdict.
part to reduce the size of a verdict when we have only the cold record before us, yet the element of pain and suffering of deceased is not in this case, for he died instantly. So we are in as good position as the jury to determine from the facts the pecuniary damages that ought to be assessed. Like the jury, we have before us the respective ages of deceased's dependents, the life expectancy and condition of health of deceased, and the evidence respecting his average earnings at the time. While it is a logical presumption that a railroad engineer thirty-five years of age had not reached the maximum of his earning capacity, yet we are not unmindful of the fact that railroading is regarded as an extremely hazardous vocation and that the life expectancy of one so employed is somewhat less than that arrived at by the American Experience Tables. [Gill v. Railroad, 302 Mo. l. c. 331.] We well know that ofttimes juries are more inclined to be liberal than just. We regard $25,000 as an ample assessment of damages under the facts here in evidence. Of course, no monetary allowance to plaintiff and her children can take the place of the deceased husband and father. But the income from $25,000, properly invested in safe securities or investments, will closely approximate the net earnings of deceased at the time of his death. To allow more would amount to an unwarranted speculation upon his length of life and possible increased earnings. If, therefore, the plaintiff will file with the clerk of this court and enter herein a voluntary *remittitur* of $5,000 within ten days from the filing of this opinion, the judgment will be affirmed for $25,000 as of the date of its rendition in the trial court; otherwise, the judgment *nisi* will be reversed and the cause remanded. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion of SEDDON, C., is adopted as the opinion of the court. All of the judges concur; *Graves, J.,* in the result.